UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

      Plaintiff,

 -vs-                         Case No. 19-CR-25-JDP

ALEXANDER W. KAWLESKI,           Madison, Wisconsin
                                      December 16, 2020
        Defendant.           1:08 p.m.

---

STENOGRAPHIC TRANSCRIPT OF VIDEOCONFERENCE EVIDENTIARY HEARING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                Office of the United States Attorney
                BY:   LAURA A. PRZYBYLINSKI FINN
                     ELIZABETH ALTMAN
                Assistant United States Attorneys
                222 West Washington Avenue, Suite 700
                Madison, Wisconsin  53703

For the Defendant:

                Federal Defender Services of Wisconsin
                BY:   JOSEPH A. BUGNI
                22 East Mifflin Street, Suite 1000
                Madison, Wisconsin  53703

Also appearing:   ALEXANDER W. KAWLESKI, Defendant

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

1        (Proceedings called to order at 1:08 p.m.)

2            THE CLERK:  Case No. 19-CR-25-JDP, *United States of*

3    *America v. Alexander Kawleski*, called for an evidentiary

4    hearing.

5        May we have the appearances, please.

6            MS. PRZYBYLINSKI FINN:  On behalf of the United States,

7    Laura Przybylinski Finn along with Elizabeth Altman for the

8    United States.

9            THE COURT:  Good afternoon.

10            MR. BUGNI:  Good afternoon, Your Honor.  Joe Bugni

11    appearing on behalf of Alexander Kawleski.

12            THE COURT:  All right.  Good afternoon to everyone

13    here.

14        All right.  So we're here to follow up on the -- I guess

15    what we're dealing with is a defense proffer for the evidentiary

16    hearing that has been requested.  I got Mr. Bugni's memo.  I'm

17    not sure exactly how to proceed.  Mr. Bugni's memo was meant to

18    lay everything out for me in advance, so he's done that.  Why

19    don't we start by getting the government's response to the memo,

20    and then we'll use the time as Mr. Bugni suggests, to clarify,

21    amplify, and answer my questions.

22            MS. PRZYBYLINSKI FINN:  Thank you, Your Honor.  The

23    government's position remains the same, that if this is newly

24    discovered evidence at all, that it's inadmissible as hearsay,

25    and if it is admissible, it's only admissible for impeachment,

1    and, therefore, does not support grounds for a new trial.  We're

2    really talking about Mr. Cecil's statement, and I think it's

3    important to go back to what it is he actually said, how many

4    times he changed his statement, and what it could even possibly

5    mean.

6        So initially this comes up because he called our office and

7    said, "Look, my ex-girlfriend, mother of my kid, testified.  I

8    think she might have lied at trial."  Okay?  So we go, and we

9    follow up.  When we follow up, he says very clearly that Tracy

10   did not say anything specific about what was on the Apple

11   computer, and she talks about that Apple computer.  That's what

12   Mr. Cecil says the issue is, that she had this Apple computer

13   and that she found images of young girls.  That was it.  That's

14   all he knew.  Then miraculously when Mr. Bugni goes and

15   interviews him, he's like, "Well, she said that there were

16   images of his stepdaughter flashing him."

17       First of all, there are no images on that Apple computer at

18   all.  There are no images on the phone drive of any flashing, so

19   at best this is Mr. Cecil making up things as he goes along.

20   He's an unreliable witness no matter what he says, and it's just

21   not enough for a new trial.  It's an extraordinary remedy, and

22   there's just nothing extraordinary here really except for the

23   new theory of defense that really seems to be made up out of

24   whole cloth, and if not, if Mr. Kawleski really says this is how

25   this happened, all of that was available to him at the time of

1    trial.  That certainly is not newly discovered.  And, finally,

2    this idea that the text message supports this or that Mr. Bugni

3    can somehow testify and corroborate Mr. Kawleski, it makes no

4    sense to me.

5         THE COURT:  All right.  Mr. Bugni, why don't we zero in

6    on the part that I think -- there was a part that's new here.

7    So we didn't know anything about Mr. Cecil before, but what's

8    left?  What is he really saying?  And before you do that, let's

9    just address your analysis of the PNY flash drive itself.  I

10   gather from your memo that that yielded nothing of value to you.

11        MR. BUGNI:  Yes.  It yielded only that we cannot say

12   what computer that they were downloaded to.  That was the hope,

13   that it would say whether or not it came from a gaming device or

14   whether or not it came from another computer, and we could see

15   nothing from that.

16        THE COURT:  All right.  So that's -- there's nothing

17   new there.  So what we have really is Mr. Cecil's statement --

18        MR. BUGNI:  Correct.

19        THE COURT:  -- and if we boil it all down, it really is

20   Mr. Cecil's statement that Tracy Brown told him at one time, "I

21   had had the flash drive for some time."  Is that the nub of it?

22        MR. BUGNI:  It's -- yeah.  Yes, yes.  "I've had the

23   flash drive for some time," but also that, "I've seen these

24   underage -- these photos, these inappropriate photos, of Mr.

25   Kawleski and his stepdaughter," and describing that.  So, you

1    know, it's a twofer.  One, "I've had it for a long time," and,

2    two, in 2016 or 2017 her saying, "I've seen these photos.  You

3    know, they're troubling to me," and those photos are of, you

4    know, Kawleski's underage daughter.  When they go to the

5    computer, there's no photos there, and she never reported ever

6    otherwise seeing these inappropriate photos of Mr. Kawleski and

7    his daughter, and it's not a fair -- it's a reasonable jump that

8    the underage photos that she's talking about are actually the

9    videos that were at the basis of the indictment.

10        THE COURT:  It is not -- tell me what you're saying.

11   There's nothing to say what -- we don't know what photos she's

12   talking about in the Cecil statement.

13        MR. BUGNI:  Correct.  It's just not unreasonable to

14   assume or for a jury to assume that those are -- that she's

15   talking about these videos because there's no other

16   inappropriate photos that we have of, you know -- that Mr.

17   Kawleski took of Amanda.

18        THE COURT:  Well, I guess the question becomes she had,

19   in Mr. Cecil's version, referred to a photograph of the

20   stepdaughter flashing Kawleski, and nothing that was charged in

21   the indictment could fairly be described as flashing Mr.

22   Kawleski.

23        MR. BUGNI:  Correct.  Everything would be characterized

24   as inappropriate, which is what -- you know, that's also how she

25   described it.

1          THE COURT:  Uh-huh.

2          MR. BUGNI:  And, Your Honor, if I could just speak to

3     that, it wouldn't be unreasonable for her to minimize what she

4     had seen.  You know, she's in a custody battle with Mr. Cecil or

5     they're raising a kid, and if she tells him, "Hey, I saw, you

6     know, Mr. Kawleski sexually assault his daughter," he's probably

7     like, "Look, you've got to go to the police or you've got to get

8     my kid away from Mr. Kawleski.  I don't want him around her."

9     He already doesn't like Kawleski, so she would minimize what she

10    had seen.  That's not an unfair assumption that when she repeats

11    it to Cecil, she says, "Hey, it's not -- you know, it's not

12    everything that I have seen, but it's something inappropriate.

13    It's involving flashing of the stepdaughter.  It's something

14    that is inappropriate," and that's what she was reporting to

15    Mr. Cecil.

16         THE COURT:  Help me understand how this would come in

17    at trial.  I think you tried to lay it out in your memo, but it

18    does seem to me that it's -- it seems like it's hearsay to me.

19    You said it wouldn't be admissible for the truth, but I don't

20    see how we get around the fact that we're actually looking at

21    statements that Tracy Brown made out of court that need to be

22    true for them to be of use.  "I had the flash drive for a long

23    time."  That's got to be true for it to be relevant.

24         MR. BUGNI:  Well, that has to be true.  The

25    inappropriate photos and the fact that, like, she saw them in

1    2016, I don't need that to be true.  In fact, I don't believe

2    it's true.  I believe she saw the shower videos or the sexual

3    assault.  But I'm offering that in -- three years before she

4    says she finds the flash drive, there's evidence that she's

5    found inappropriate pictures, and these inappropriate pictures

6    are the same ones that are on the flash drive.  She couldn't

7    have otherwise seen it.  She couldn't -- if she found it in

8    2019, then she wouldn't have reported seeing of the same genre

9    of inappropriate pictures in 2016, and so that's what I'm

10   offering it for is that verbal act, that she tips it off, "Look,

11   I saw it before I could have otherwise seen it," and that's what

12   the key is.  But, you know, her statement, "I've had the flash

13   drive or held onto it, you know, longer than what I said," that

14   is a true statement.  I would need that to actually be true.

15            THE COURT:  So then that comes -- that's really just a

16   prior inconsistent statement that you get to confront Tracy

17   Brown with.

18            MR. BUGNI:  Correct, but it's a very important prior

19   inconsistent statement.  I mean, you know, I tried to

20   distinguish between mere impeachment and kind of the core, vital

21   impeachment.  I went back --

22            THE COURT:  That's a different issue.  We'll work

23   through that, but at this point I just want to try to visualize

24   what the trial is going to be like.  So you get to confront

25   Tracy Brown with this prior inconsistent statement that she made

1    to Mr. Cecil about having actually seen inappropriate images and

2    having the flash drive for a long time prior to 2019.  And then

3    you get to confront her with that, but you don't get to put in

4    extrinsic evidence to support that prior inconsistent statement.

5         MR. BUGNI:  You're right.  I would not be able to put

6    in if it was a tangential matter, but I think this goes to the

7    core matter.  Your discretion would be you could let me bring it

8    in or you could keep it out as far as, like, what I would be

9    able to impeach that with.  I think this would go to such a core

10   issue that this would involve *Chambers* and -- I forget -- *South*

11   *Carolina v. Holmes* where you would have the discretion, you

12   would say, "This is to such a core matter under the Sixth

13   Amendment that I'm going to let Bugni impeach with extrinsic

14   evidence of this."  So I don't think it's -- it's not taken out

15   that I could never do this.  It would be up to your discretion

16   to do it.

17        THE COURT:  Uh-huh.  Okay.  So let's talk then about

18   the standards that are applicable here, and I think that -- you

19   tell me where we disagree.  First of all, this is all

20   discretionary with me.  I get the discretionary decision.  I

21   think the case -- I've forgotten the case now but the one that

22   you cited and relied on most centrally where the Court of

23   Appeals affirmed the decision to grant a new trial on impeaching

24   evidence because the DEA analyst was under a cloud of

25   investigation.  What's the name of that case?  Is that *Rogers?*

1          MR. BUGNI:  *Baker*.

2          THE COURT:  *Baker.*  All right.  So the interesting

3     thing about that case is that the Court begins by saying, "Hey,

4     look, this really illustrates what discretion means because this

5     very same testimony is at issue in several cases, and judges

6     have granted new trials and denied new trials considering the

7     same evidence, and we're affirming all of them, the grant and

8     the denial.  It's a discretionary -- that's what discretion

9     means."  And so I take your point that if this were impeachment

10    of such an important point, I could grant a new trial, and that

11    would be sustained.  At the same time I could say, "Actually,

12    it's not very good impeachment.  I'm going to deny the new trial

13    because it's not very powerful impeachment."

14          MR. BUGNI:  That would be unfortunate, but I think

15    you're right.  You have that -- like, this is really a

16    discretionary call.

17          THE COURT:  Yeah.

18          MR. BUGNI:  I would -- go ahead.

19          THE COURT:  Ms. Przybylinski Finn, do you agree with

20    the standards that are applicable here?

21          MS. PRZYBYLINSKI FINN:  I do agree that it's the

22    Court's discretion as to whether to grant a new trial, but the

23    standards are that it's extremely rare and that the evidence has

24    to be admissible.  I mean, those are the important standards.

25    Of course the Court has discretion, but I just -- I can't get

1    around the fact that Cecil is just a liar and a troublemaker.  I

2    mean, he's changed his story.  His story is inconsistent even

3    with the person he gives as his alibi, his ex-girlfriend A.H.

4    She doesn't even corroborate him.  It sort of flows with whoever

5    is asking him the questions.  So how that can be a basis for a

6    new trial, it's just --

7              THE COURT:  Help me understand that, Ms. Przybylinski

8    Finn, because I understand the inconsistencies that you pointed

9    out, but I don't know if I would really describe that as rising

10    to the level of characterizing him as a liar.  He's got

11    variations on what he has said, but I don't know if I would say,

12    "Oh, yeah.  He's lied about this or lied about that."

13              MS. PRZYBYLINSKI FINN:  Well --

14              THE COURT:  He has the opinion that the images came

15    from the Apple tower, which apparently there's nothing to

16    corroborate that and there's no real basis for it, but I don't

17    know if I'd characterize that as a lie.  It's kind of his

18    surmise, and, of course, if it came down to it, whether we

19    needed that surmise to get a new trial, I would reject that

20    because we're not going through a new trial on Mr. Cecil's

21    surmise about where the images came from.  But I don't know if

22    I'd quite characterize him as a liar.  He's a little all over

23    the map, but I don't know if I'd really categorize him as a

24    liar.

25              MS. PRZYBYLINSKI FINN:  Well, he's a liar in these two

1    ways:  He told Bailey in 2018 -- so he tells Detective Bailey

2    that in the year 2018 Tracy Brown told him that the defendant

3    gave her an Apple tower computer and that on that computer she

4    found videos of the defendant with underage girls.  That is 100

5    percent not true.

6        Detective Bailey then asks Cecil whether Brown shared any

7    details about the videos.  Cecil responded that Brown did not

8    share details and said only that the videos were of underage

9    girls.  Now, had she actually said that, "I saw pictures of

10   Alex's stepdaughter and him flashing her [verbatim]," had she

11   actually said that, the time to have come clean on that is when

12   he's talking to Detective Bailey.  He's absolutely clear that he

13   says she's got the tower, that she told him she saw the videos

14   on the tower, and that the videos were just of underage girls

15   and nothing more specific.  It's only when Mr. Bugni or his

16   investigator goes and talks to him later that now suddenly he

17   says, "Well, she didn't" -- she said that it was his -- Alex's

18   stepdaughter and that it was his stepdaughter flashing him.

19       It's true that it was speculation on his part that she

20   copied the videos onto the flash drive from the computer, but he

21   starts by saying, "She told me that these videos were on the

22   Apple tower computer," and that was the focus all along, and now

23   the story is just changing to just sort of, you know, fit into

24   sort of this new idea of what, you know, that somebody is

25   suggesting might have happened.  Again, Cecil uses his

1    ex-girlfriend to say, "Hey, you can ask her.  She was there.

2    She knows what happened."  She says, "Absolutely not.  I was not

3    there.  I don't know what he's even talking about.  What I do

4    know is this, is that Tracy Brown called me when she found that

5    flash drive and said, 'I found these upsetting things.  I turned

6    them into the police, and now I'm sick to my stomach, and I

7    don't know what to do.'"  That's absolutely consistent with

8    trial testimony.  So to me when we look at what Cecil has

9    actually provided, it's really just sort of this vague

10   suggestion, maybe vindictive on his part, that he just doesn't

11   think that's the way it happened.

12        And, finally, when we're talking about what's reasonable

13   and unreasonable, it makes -- Tracy Brown doesn't know federal

14   law.  She doesn't understand that a flash drive has to have

15   traveled in interstate commerce for an element of the federal

16   offense, so why would she make all this up?  Who cares?  I mean,

17   it shows a crime.  It shows him committing a crime.  She doesn't

18   need to jump through all these hoops with the police and say

19   here's -- make up a way that she found it or, if you buy into

20   Mr. Bugni's suggestion that she kept this for years and years

21   and years to just finally turn it in when the time was right,

22   and the time's right because Mr. Kawleski didn't go bowling with

23   her?  I mean, it just doesn't make sense.  And so we're talking

24   about what's reasonable and unreasonable.  That's unreasonable.

25             THE COURT:  All right.  Mr. Bugni, what else do you

1    have to explain?

2         MR. BUGNI:  Just a few things, Your Honor.  One, the

3    suggestion that we've somehow fed Mr. Cecil what he should say,

4    that's ridiculous.  Detective Bailey doesn't have the vested

5    interest in this case that we do, and the fact that our

6    interview, we asked more pointed questions, that's for you to

7    decide when you see him, Mr. Cecil.

8         Second thing, Bailey's interview wasn't recorded.  If this

9    was -- you know, what was actually said in Bailey's -- you know,

10   it should have been recorded.

11        And, third, Your Honor, the point is Kawleski would know

12   that this was missing.  If she hadn't taken it and copied it,

13   this is not the kind of flash drive that is just, you know,

14   hanging out there.  And we've also brought to you --

15        Sorry, Your Honor.  Are you still there?  Everything is

16   frozen --

17             THE COURT:  I'm still here.  I can see you --

18             MR. BUGNI:  Sorry.

19             THE COURT:  -- and everybody is moving on my end.

20             MR. BUGNI:  Okay.  Sorry.  Mine is not working as well.

21        The other problem with that, Your Honor, is when -- you

22   know, we have that text message right after -- when Kawleski is

23   arrested and he gets out on bond, he's texting, "Hey, I still

24   didn't even know it was there" -- I can't remember the exact

25   term -- or, "I didn't know it was still there yet," and it shows

1    that this was not something that he had held onto and that he

2    was, you know, aware of at that time, and that fits with his

3    testimony or what the proffered testimony would be.  Cecil fits

4    with that, and when you're looking at what a jury would decide

5    and whether or not they would find that this was reasonable, you

6    have to weigh all these facts.  It's not just did he do

7    something wrong.  I've always embraced that.  Opening statements

8    through closing, we've always embraced that Kawleski did

9    something terrible, but the question is whether or not he

10   possessed this hard drive in January 2019, and the question is

11   also whether or not he was the one who copied that flash drive.

12       Now, I used, you know, an argument in closing that you

13   can't trust Brown's testimony.  It was incredible, the fact

14   that, like, she had this premonition or this intuition that

15   something was going to go wrong, and she goes and just happens

16   to pick the one flash drive, happens to have somebody on the

17   phone, and she's going through it the whole time.  It seemed a

18   very difficult story to buy when there's another story to buy,

19   and it's right there, and this is a very reasonable story, and

20   this is actually, like, a true story, and it's backed up by

21   facts.  And that's why Cecil's testimony is so important.  It

22   reframes everything, and it says years earlier, right around

23   when Kawleski destroys this flash drive, the flash drive that he

24   had put it on, Brown makes this weird call to Cecil and says,

25   "Hey, I found these inappropriate photos."  There's no other

1    explanation, and Bailey doesn't push.  Where else would there

2    have been inappropriate photos?  Where else would that have come

3    from?

4         And the next step should be we're talking about these

5    videos.  She finds these videos.  She doesn't know what to do.

6    She calls Cecil.  She kind of gives him a weak version of what

7    she had seen, and she holds onto it.  She doesn't want to turn

8    him in yet.  You know, hopefully everything goes on well with

9    their relationship, and, you know, maybe it never has to be

10   used.  But she held onto this, and then when things went really

11   sour -- and it's not because he didn't go bowling.  It's because

12   he was flirting with another girl and continuing his cheating

13   ways on her and a huge fight ensues.  That's a huge point, Your

14   Honor, and that's actually -- that's what raises a reasonable

15   doubt whether or not, you know, she had -- he possessed this

16   flash drive in 2019 when it's charged and whether or not he was

17   the one who copied it onto the PNY flash drive.

18              THE COURT:  A couple of points here:  One is you had

19   almost all of this theory available to you at the time of the

20   trial.  The only bit that you didn't have was the relatively

21   modest corroboration of your theory that there was the statement

22   that Cecil reports that Tracy Brown said sometime previously,

23   "I've seen these inappropriate images or have had this flash

24   drive a long time."  But the whole idea that Kawleski had gotten

25   rid of the flash drive, you had all that available to you

1    because it comes from Kawleski himself, and so -- and the attack

2    on Tracy Brown's credibility was sort of the centerpiece of your

3    defense, so all that was on the table, and you tried to impeach

4    her credibility, with some success in my view.  I thought, I

5    don't know, her story does not ring true in every detail.

6        Which leads me to the second point, which is the problems

7    with Tracy Brown's testimony don't necessarily suggest -- in

8    fact, I think it's kind of extraordinary to say that it suggests

9    that she's the one who made the flash drive.  It suggests to me

10   that she knew what might have been on that flash drive because

11   she had seen inappropriate images that Kawleski had before.  And

12   so, yeah, that's inconsistent with what she said, but it's not

13   devastating impeachment in the sense that it doesn't show that

14   she made the flash drive.  It just shows that she probably knew

15   about it before, and, of course, she didn't want to say she knew

16   about it before and didn't do anything, so she denies any prior

17   knowledge of it.  But the point being that she FaceTimed with

18   her friend on the way home because she had a strong inkling of

19   what was going to be on that flash drive, and it had nothing to

20   do with Mr. Kawleski flirting with other women.  It was the

21   images of minors that she was aware of somehow.

22       And so those are two observations that to me diminish the

23   importance of the new evidence that you have from Mr. Cecil.

24       MR. BUGNI:  Sure.  So I'll address both of them.  So as

25   to the first point, Your Honor, I did have all of the -- I had

1    Kawleski's story from the beginning, whatever day it was.  I
2    think it was February 25th of 2019 when I first met with him.  I
3    had to make tactical decisions in this trial because if you
4    remember, it was Counts 2 through 15, I think 2 through 15 or 2
5    through 14, they were the attempt counts, and if I put Kawleski
6    on the stand and I go all in that she transferred the PNY flash
7    drive, all they have to do is ask what camera did you use?  What
8    did you use in this attempt?  And so I can win Count 1 with
9    this -- with Kawleski, but then I lose 2 through 16 or 2 through
10   15.  If I go in and I win on 2 through 15 with the interstate
11   commerce, which is ultimately what you granted a Rule 29 on, I
12   still have a better argument on 1 and 16 that I did make to the
13   jury -- or Count 1 and Count 16 I conceded.  I said, "Look, I've
14   got to give them something because nobody is going to want to
15   walk away letting Kawleski get away free."
16       Those were all the tactical decisions I had to make.  So
17   whether I would go back in time and make the same arguments, I
18   don't know.  If I had Cecil's testimony, that would have been
19   really hard to pass up because I think it would have really gone
20   to the core of my argument against Tracy Brown, which was really
21   Count 1.  I tend to think that you would -- I would have gotten
22   a reversal on the Rule 29 on Counts 2 through 15 in the Court of
23   Appeals.  I think it was -- your analysis was absolutely
24   correct.  It was what I had argued, you know, from opening
25   statement through or when I first made the Rule 29.  The PNY

1    flash drive was not used in the attempt.  So I probably would

2    have been willing to sacrifice that for Count 1, but it would

3    have been a tough choice, and I don't have a time machine to see

4    exactly what I would have done, but I know that Cecil would have

5    made it a very hard choice, and I probably -- you know, would I

6    put Kawleski on the stand?  Probably.  Would I have used Cecil?

7    Definitely.  I mean, I was using everything I could to impeach

8    Brown, and you're right about her story.

9        The second is it's hard to say what's reasonable.  Now, do

10   I agree that in normal human behavior she probably saw this

11   beforehand and that explains a lot of, like, why she happened to

12   choose the one?  Yeah, I think that's a pretty fair argument,

13   Your Honor, except for the fact that Kawleski burns it.  So he's

14   got to burn something, and he could have burned the wrong one.

15   It's completely possible.  He's been drinking.  He's been in a

16   bad drinking bout during that time, but he burns one.  Could he

17   have burned the wrong one?  Absolutely.  He could have

18   completely burned the wrong one.  It seems unlikely though given

19   the difference in the description.  So that has to lead to one

20   other reality is that Brown had it, and she transfers it, and

21   it's not that she transfers it because she knows the federal

22   jurisdiction.  She transfers it because she'd always have that

23   evidence.  Kawleski probably would recognize if that flash drive

24   was gone if she would -- you know, he goes back to find it.

25   "Where's the gray flash drive?  Where is the bluish-gray flash

1    drive?  I know it should be here."

2         That's why it's different than just the reasonable, yeah,

3    she knew -- she's seen it before, and she always knew it was

4    there.  That's not a bad inference.  That's a very fair

5    inference that you're making, Your Honor, except that Kawleski

6    destroys one.  And I think when you see that text message, "I

7    didn't even know I had that thing yet," like, that tends to

8    substantiate that this is a guy who said, "Hey, I destroyed this

9    thing.  I didn't even know I had this four years ago or three

10   years ago," however long it had been that he had destroyed it.

11        So those are the two points, Your Honor, when you're

12   looking at the discretionary call and whether or not that rises

13   to a reasonable doubt, that is the type of thing that a jury

14   would latch onto.  I think I would latch onto it.  It allows for

15   that inference and really it allows for a reasonable

16   probability -- or I can't remember -- probably a not guilty

17   verdict.  It probably raises a reasonable doubt.

18             THE COURT:  Ms. Przybylinski Finn, anything else for

19   the government?

20             MS. PRZYBYLINSKI FINN:  Your Honor, I would just note

21   that I don't think that the text message corroborates anything

22   at all.  It doesn't say, "This is nuts.  I burned that thing."

23   This doesn't say, "Are you crazy?  I threw that thing in a

24   fire."  So I don't think the text message does much of anything.

25        Secondly, the idea that she happened to find this thumb

1   drive and copy it before he decided to throw it in the fire

2   sometime that we don't know when that is, again, this is all --

3   this is so speculative, there's nothing to corroborate it, and

4   it just certainly is not a basis for a new trial here.  Mr.

5   Kawleski had his trial.  He had all the evidence.  He had an

6   opportunity to have an expert look at that flash drive yet again

7   and, as the Court pointed out, must not have found anything

8   useful on that or we'd be talking about that today.

9        So I just -- it just strikes me there's just nothing here

10   that goes to that whole this is an extraordinary remedy.  We go

11   back to a new trial is an extraordinary remedy, and there is

12   nothing to support it here.

13        THE COURT:  All right.  Mr. Bugni, you got anything

14   else?

15        MR. BUGNI:  Your Honor, I would just make two points:

16   It is an extraordinary remedy, but it's extraordinary that we're

17   talking about a man going down for 15 years when there would be

18   a more robust case, his opportunity to make the complete

19   arguments that he's entitled to make.  Again, we've never denied

20   that he did something terribly wrong, and the equities are not

21   on our side when it comes to that, but that's not what the

22   demand is.  The demand is what the law demands, and here the law

23   supports our reading of what -- you know, what our showing has

24   been even if it's just Count 16.  Count 16, did he have

25   possession of this flash drive in 2019?  Then when it comes to

1    Count 1, we've shown a reasonable probability or we've shown

2    that it would probably lead to a different result.

3         As far as the text message, you're right, it doesn't go

4    that far to say, "I thought I burned it," but it says, "I didn't

5    even know I had that thing.  I didn't even know I had that

6    thing."  This is contemporaneous.  This is, you know, sent on

7    February 16th, 2019.  He just gets out on bond, and they're

8    texting back and forth.  That's a huge indicator, Your Honor,

9    that what we're offering is truthful, that this is a man who

10   thought he had destroyed that flash drive, and everything else

11   that's happened supports that.

12        Your Honor, I would just ask you to exercise your

13   discretion and allow him to proceed to a new trial with this

14   evidence and with Mr. Cecil.

15            THE COURT:  All right.  I'm going to deny the motion

16   for a new trial.  I don't think we -- based on the proffer that

17   I've had here, we don't need any further evidentiary hearing on

18   this.  I think what we have here is a theory that was

19   fundamentally available to the defense at the time of the trial.

20   What has emerged since the trial has been Mr. Cecil's

21   statements, which offer at best some modest corroboration of Ms.

22   Brown's knowledge of questionable images of minors at an earlier

23   date.  I'm not sure how it gets presented at trial.  As I said,

24   it seems to me that it's a prior inconsistent statement that Ms.

25   Brown can be confronted with.  I don't think it actually is very

1    compelling evidence that she created the flash drive.  It

2    suggests to me at best that she knew that Mr. Kawleski had

3    inappropriate images of minors earlier, which is the part of her

4    testimony that I found a little bit questionable.

5        But the jury had, at the time it made its decision, had Mr.

6    Bugni's attack on her credibility, and as a matter of trial

7    strategy, Mr. Bugni chose not to put Mr. Kawleski on the stand

8    so that he could present what he had of this theory, which was a

9    lot of it, which is the theory that the flash drive that he had

10   actually created had been burned, but he chose not to present

11   that for strategic reasons, and matters of trial strategy, it

12   seems to me, are really not -- not in and of themselves a basis

13   for a new trial.  I recognize that newly discovered evidence can

14   have a dramatic impact on trial strategy, but I don't think this

15   is that case.  There is a little bit of additional evidence that

16   Mr. Bugni didn't know about from Mr. Cecil that he didn't have

17   at the time, but I don't think it really is so transformative

18   that it would have produced a completely different strategy and

19   result in a different result.  So I don't think that it is

20   evidence of the scale that really would warrant a new trial.  I

21   don't -- I just don't think that it is that significant that it

22   warrants doing the new trial on the counts that are left, which

23   I guess are really just Count 1 and Count 16.

24       So I'm going to deny the motion for a new trial.  I'll just

25   do a written order that confirms this.  It's not going to have a

1    lot of reasoning in it -- I'm giving you that now -- and from my

2    questions I'd just indicate that what we have is statements from

3    Mr. Cecil that at best suggests that Tracy Brown knew about

4    the -- about some inappropriate images of the minors.  We don't

5    know what they are.  Inappropriate images cover a pretty broad

6    spectrum, and then that also might explain the peculiarities of

7    the story that she told, which seemed odd because it did seem to

8    me that maybe she had an inkling of what was on the flash drive

9    that she had, but none of that comes close to any sort of

10   evidence that suggests that anybody other than Mr. Kawleski

11   actually produced that flash drive.

12       So I'm going to deny the motion for a new trial.  We don't

13   need any further hearing on it.  I'll just issue an order that

14   summarizes that, and then we can proceed with the sentencing.

15       Is there anything else we needed to address today, Ms.

16   Przybylinski Finn?

17          MS. PRZYBYLINSKI FINN:  No, not for the United States,

18   Your Honor.

19          THE COURT:  All right.  Mr. Bugni?

20          MR. BUGNI:  Can we schedule sentencing now?

21          THE COURT:  Yeah.  Let's see.  So we have a presentence

22   report, I believe, so that --

23          MR. BUGNI:  We had to do objections -- sorry.

24          THE COURT:  What's left?

25          MR. BUGNI:  I think we have objections, and they'll

1    have to revise it with the multicount analysis, but it shouldn't

2    be much based upon Counts 2 through 15 being dismissed, so maybe

3    the first or second week in January?  I don't want to push

4    probation, but I don't think there needs --

5              THE COURT:  Well, I don't have the input -- I don't

6    have input from probation about how long they need to revise the

7    report so why -- let's do this:  Tell me what dates you're

8    looking at, what range.  So first or second week of January.  So

9    I infer from this you would like to get the sentencing done as

10   soon as possible, Mr. Bugni.  Is that the takeaway here?

11             MR. BUGNI:  Yes, Your Honor.

12             THE COURT:  Okay.

13             MR. BUGNI:  He's been in jail for two years so --

14             THE COURT:  I understand, and I'm happy to be

15   supportive of that.

16        Ms. Przybylinski Finn, are there any constraints, any

17   objections on the government's part to going as quickly as we

18   can to get to sentencing?

19             MS. PRZYBYLINSKI FINN:  No, Your Honor, but I agree

20   with Mr. Bugni.  We've not done objections, and I don't know

21   what the final PSR will look like, so I would ask for the second

22   week in January at least just to give everybody an opportunity.

23             THE COURT:  All right.  Here's what I'm going to do --

24             MS. PRZYBYLINSKI FINN:  If that works for Ms. Altman.

25             THE COURT:  Well, and, again, I would -- the person

1    that matters most or at least first here is the officer, and I

2    can't even remember who wrote the presentence report.  So I've

3    got to find out from the officer who has got to revise the

4    presentence report what kind of time they need, and I'm sure

5    they're not -- they don't need a huge amount of time.  But let's

6    aim for the second week in January, but before I commit us to

7    that, I'm going to check with probation and make sure that they

8    can get that -- get the revised report done, and then you'll

9    have an objection period.  So how long do you need for

10   objections?  A week?

11            MS. PRZYBYLINSKI FINN:  A week is fine.

12            MR. BUGNI:  A week, yeah.  A week is fine.

13            THE COURT:  Okay.  So if not for the fact that there's

14   the holiday in the middle there and I don't know what the

15   workload of this officer is, the second week of January should

16   work for me.  So let me check with that officer and see if we

17   can do that, and then we will -- let's look at some days here on

18   the second week.  Let's aim toward the end of the second week of

19   January.  So what if we were to do January 14th?

20            MR. BUGNI:  Perfect.

21            MS. PRZYBYLINSKI FINN:  That works for the government.

22            THE COURT:  Okay.  So let's go 10:00 a.m.  I'll fill in

23   the interim dates after I talk to the probation officer, and

24   that's all contingent on this working out with the supervising

25   officer.  If it doesn't, I'll have Susie reach out and contact

1    you to pick a different date.

2            MS. PRZYBYLINSKI FINN:  And it's Mariah Johnson, Your

3    Honor.

4            THE COURT:  Okay.  I'll check with her this afternoon.

5            MS. PRZYBYLINSKI FINN:  Thank you.

6            MR. BUGNI:  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you, all.

8            THE CLERK:  This court stands adjourned.

9         (Proceedings concluded at 1:44 p.m.)

10                          ***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that the

3   foregoing is a true and accurate record of the proceedings held

4   on the 16th day of December, 2020, before the Honorable

5   James D. Peterson, Chief U.S. District Judge for the Western

6   District of Wisconsin, in my presence and reduced to writing in

7   accordance with my stenographic notes made at said time and

8   place.

9        Dated this 24th day of February, 2021.

10

11

12

13

14

15                            _____/s/ Jennifer L. Dobbratz_____

16                            Jennifer L. Dobbratz, RMR, CRR, CRC
                                    Federal Court Reporter
17

18

19

20

21

22

23

24   The foregoing certification of this transcript does not apply to
     any reproduction of the same by any means unless under the
25   direct control and/or direction of the certifying reporter.