UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,

               Plaintiff,

     vs.                      Case No. 19-CR-025-JDP

ALEXANDER KAWLESKI,          Madison, Wisconsin
                              January 28, 2021
               Defendant.     1:30 p.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF VIDEOCONFERENCE
SENTENCING HEARING
HELD BEFORE CHIEF JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:
        Office of the United States Attorney
        BY: ELIZABETH ALTMAN
           LAURA PRZYBYLINSKI FINN
        Assistant United States Attorneys
        222 West Washington Avenue, Suite 700
        Madison, Wisconsin  53703

For the Defendant:
        Federal Defender Services of Wisconsin, Inc.
        BY: JOSEPH A. BUGNI
        Madison Branch Office
        22 East Mifflin Street, Suite 1000
        Madison, Wisconsin  53703

Also Present:
        Alexander Kawleski, Defendant
        Mariah Stieve, U.S. Probation Officer

CHERYL A. SEEMAN, RMR, CRR
Official Court Reporter
United States District Court
120 North Henry Street, Room 410
Madison, Wisconsin  53703
1-608-261-5708

1          (Called to order at 1:30 p.m.)

2          THE CLERK:  Case No. 10-CR-25-JDP-1, the *United*

3  *States of America v. Alexander Kawleski*.  Court is called

4  for sentencing.  May we have the appearances, please?

5          MS. ALTMAN:  Good afternoon, Your Honor.  The

6  United States appears by Elizabeth Altman and Laura

7  Przybylinski Finn.

8          THE COURT:  Good afternoon to you.

9          MR. BUGNI:  Good afternoon, Your Honor.  Joe

10  Bugni appearing on behalf of Alexander Kawleski.

11          THE COURT:  Good afternoon to both of you.  I'll

12  also note that Mariah Stieve is on the call with us.  She

13  is the probation officer who prepared the presentence

14  report.

15      We were having some audio difficulties with my end of

16  some earlier proceedings and so I've got a different

17  microphone connected now and so I just want to confirm

18  that you can hear me okay.  Ms. Altman, can you hear okay?

19          MS. ALTMAN:  I can, Your Honor.  Thank you.

20          THE COURT:  Mr. Bugni?

21          MR. BUGNI:  I can, Your Honor.

22          THE COURT:  All right.  Very good.  So we're here

23  for sentencing and we're proceeding by video

24  teleconference because I have determined for the Court

25  that we can't proceed in person without imposing undue

1   risks on the participants in the case.  But I think the

2   interests of justice compel us to move forward with

3   Mr. Kawleski's sentence despite that, but we can do it

4   this way only if he agrees to proceed this way.

5        So, Mr. Kawleski, do you understand that you've got

6   the right to appear before me for your sentencing?

7                THE DEFENDANT:  Yes, I do.

8                THE COURT:  And you're willing to waive your

9   personal appearance and proceed by videoconference.

10                THE DEFENDANT:  Yes.

11                THE COURT:  All right.  That's how we'll do it

12   then.  I've got a lot of material in this case and so I'm

13   going to run down what I think are the main documents that

14   I have reviewed in connection with the sentencing to see

15   if I missed anything.

16        So I've got the presentence report.  I've got

17   objections really from both sides, two installments here

18   from the defendant, which I will speak to momentarily.

19   And I've got an objection from the government and I've got

20   an addendum that summarized the objections.  And then I've

21   got a revised presentence report and a sentencing

22   memorandum from both sides.

23        And I've got letters in support of Mr. Kawleski, so

24   thanks to his family members who took the time to write to

25   me.  I appreciate having that input.  And then I also have

1   Mr. Kawleski's written allocution.

2       So that's what I've reviewed.  Let me know if you

3   think I have missed anything.  I know there's a lot more

4   paper that was filed.  I think I have reviewed everything

5   well beyond what I've cited here.  But let's find out, for

6   sentencing purposes, if I missed anything.  Ms. Altman,

7   anything on the government's side?

8           MS. ALTMAN:  No, Your Honor.  Thank you.

9           THE COURT:  Mr. Bugni?

10          MR. BUGNI:  No, Your Honor.

11          THE COURT:  All right.  Mr. Kawleski, I want to

12  make sure that you have read the presentence report and

13  reviewed it and the revised presentence report with your

14  attorney.  Have you done that?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do you have any other objections or

17  concerns with the presentence report?  Mr. Bugni has

18  raised some to me which I will address in a minute, but

19  are there any other concerns that you have?

20          THE DEFENDANT:  No, not that I can think of right

21  now.  I mean, there was some things in the presentence

22  report, but I can't really think of them right now.

23          THE COURT:  All right.  I'm going to give you

24  another chance to speak before we're finished.  So if,

25  during our proceeding, something occurs to you that you

1  want to speak to, you'll get the chance to do that.

2      Okay.  So I'm going to adopt the facts in the --

3  well, let me ask this: There are certain factual

4  clarifications that were offered.  Mr. Bugni, have those

5  been adequately reflected in the presentence report?

6          MR. BUGNI:  They have, Your Honor, with one

7  exception.  And I should have filed a letter this morning.

8  When I went over the addendum with Mr. Kawleski, he has

9  another cracked tooth that he was concerned about, and

10 that would be the only additional point to add to the

11 clarifications.

12         THE COURT:  All right.  We will make a note of

13 that and I'll ask Ms. Stieve to include a reference to

14 that in a future submission to make sure that all of

15 Mr. Kawleski's health concerns are addressed, if they

16 still need it, when he gets into BOP custody.

17     Okay.  So I guess this is probably as good a time as

18 any -- well, let me just state this: I'm going to adopt

19 the facts in the presentence report as the facts on which

20 I will base my sentence.  There's no plea agreement.  But

21 in determining the defendant's sentence, I will take into

22 consideration the advisory sentencing guidelines and the

23 statutory purposes of sentencing that are set out in Title

24 18 of the United States Code at Section 3553(a).

25         So let me walk down the objections.  And I believe

1   the best way to do this is to look at document 103, which

2   I think is Mr. Bugni's articulation of the objections that

3   remained outstanding after the revised presentence report.

4   Is that correct, Mr. Bugni?

5           MR. BUGNI:  Yes, Your Honor.

6           THE COURT:  Okay.  All right.  So it's a useful

7   setting out of the continued objections, so thank you for

8   that.

9       So, Mr. Bugni, the first issue is whether

10  Mr. Kawleski should receive credit for acceptance of

11  responsibility.  The government has already told me it

12  wouldn't support the third level of reduction.  The basic

13  framework here is that generally, if you go to trial,

14  you're not going to get credit, but that's not an absolute

15  rule if the defendant doesn't contest the underlying facts

16  that otherwise demonstrates acceptance of responsibility.

17      But when I judge that, I'm to look at pretrial

18  conduct, not just -- not post-trial conduct.  So I got

19  Mr. Kawleski's expression of remorse in his written

20  allocution, but what pretrial conduct would you point to,

21  Mr. Bugni, that would indicate that Mr. Kawleski has

22  accepted responsibility?

23          MR. BUGNI:  I would point to his apology to the

24  victim in I believe 2016 and again in 2018.  In fact, this

25  is a personal matter between the family and he expressed

1   remorse and he apologized to her twice.  The fact that,

2   you know, he believed he destroyed the flash drive in

3   2016, it sort of, "Look, I'm away from this."  This isn't

4   someone who continued his criminal conduct after 2014.

5        As far as, you know, whether or not he pled guilty

6   right away or what other court proceedings, I don't have

7   that, Your Honor.  But I do have that behavior that I can

8   cite to you showing this is somebody who, even before he

9   got caught, was remorseful.  It's somebody who, you know,

10  turned away from the criminal conduct and put it behind

11  him.

12        THE COURT:  I am not persuaded that Mr. Kawleski

13  has demonstrated acceptance of responsibility before

14  trial.  This is not one of those unusual cases where,

15  despite going to trial, I think that granting credit is

16  nevertheless warranted.  In fact, I think that a factual

17  component of the charge actually was disputed rigorously

18  even after trial and that was that he still had the flash

19  drive, disputed that he made that flash drive and tried to

20  put the creation of that flash drive on Tracey Brown.

21        And this is a case in which two minor victims had to

22  testify at his trial as young adults.  And so not only was

23  the government put to the effort of the trial, the victims

24  were put through the hours of the trial as well.  So this

25  is a case in which I think it's appropriate that there be

1   no credit for acceptance of responsibility.

2       The next issue is whether Mr. Kawleski should receive

3   an enhancement for incapacitating a minor.  Application

4   Note 2 of the applicable guideline section says that it's

5   broadly applicable and it cites the fact that basically it

6   applies when the victim is incapacitated.  And I think

7   that I don't know that I have to make the specific finding

8   that he incapacitated her for the purpose of conducting

9   the sexual assault, but it is definitely true that he

10  provided her the alcohol that led to her incapacitation

11  and then took advantage of the situation and sexually

12  assaulted her when she was unconscious.  I saw the video.

13  I do not believe that she was conscious during the sexual

14  assault.  So I will overrule that objection as well.

15      The next one is whether Kawleski should receive the

16  enhancement for sadistic conduct.  This objection I'm

17  going to sustain.  I agree that the sexual assault was

18  psychologically traumatizing to the victim, but that was

19  the kind of trauma that's collateral to virtually any

20  sexual assault of a minor by an adult or really sexual

21  contact with an adult.  There's always an element of

22  trauma in a case like this.

23      But reading that enhancement for sadistic conduct,

24  that broadly would mean that it would apply in a vast

25  range of cases in which there is sexual conduct between an

1  adult and an older minor victim.  I think if there is

2  penetration of a prepubescent minor, that is sadistic by

3  definition, but this is not a case in which I see the

4  conduct at issue here really was sadistic within the

5  meaning of that enhancement.  So although I agree

6  psychological pain could constitute that kind of sadistic

7  conduct, this psychological pain was just collateral to

8  the fact of the assault anyway, so I will not apply that

9  enhancement.

10      So should Mr. Kawleski receive the enhancement for

11  being a parent or guardian.  He was not literally a parent

12  or guardian, but part of his main argument here about the

13  context of these events was that he was in a marriage-like

14  relationship with his partner, Theresa, that he had a

15  family-like relationship with his own children that he

16  shared with Theresa, but that also he was in a

17  step-parent-like relationship with Amanda.

18      And so I think that it's somewhat inconsistent to

19  disclaim being in the position of a parent or guardian

20  with Amanda, given the importance of the relationship that

21  he had with Theresa and the fact that Theresa -- I'm

22  sorry, that Amanda considered Emma and Noah to be her

23  brother and sister.

24      This was a family, I agree with that, and I will

25  consider this in the context of that situation.  Even

1   though it wasn't legally recognized as a marriage,

2   nevertheless, I think that the enhancement applies.  Again

3   the application notes encourage broad application of that

4   enhancement.

5        Then we've got the argument that Count 16 should be

6   dismissed because it's a lesser included.  Here's the

7   basic problem that I see with that: People have cited to

8   me the *Johnson* case out of the Ninth Circuit.  That case

9   says that possession is a lesser included of receipt of

10  pornography and the Seventh Circuit suggested it might be

11  willing to embrace that position.

12       But those aren't the two crimes that we're talking

13  about.  We are talking about production and possession.

14  And if we take, as we must in analyzing the multiplicity

15  issue under *Blockburger*, we take an elements-only analysis

16  and we look at the elements of the one offense compared to

17  the other to determine whether one is a lesser included.

18       And production and possession each have divergent

19  elements.  You don't need to possess pornography to

20  produce it.  You could produce child pornography by

21  engaging a child in lewd conduct for purposes of

22  transmission so that you never possess the representation

23  that is created.  But to possess it, you have to have a

24  tangible representation or you have to access the

25  representation.  And you don't have to possess it to

1  produce it and so each of them has an element that the

2  other does not.

3      So when I look at the *Johnson* case, it says, look, if

4  you're going to charge the lesser included, it has to be

5  based on a different factual predicate.  We don't have

6  that problem here in the first instance because production

7  and possession are not lesser includeds of each other, so

8  possession is not the lesser included.  So they're

9  separate crimes.  They're not related in a greater and

10  lesser included issue.  So I will not dismiss Count 16 as

11  being duplicitous.  It's appropriate to convict on both

12  because they're not lesser includeds.

13      Okay.  So those are the rulings on those enduring

14  motions.  So the effect on the guideline calculation is

15  that there is -- I believe that the enhancement then

16  was -- that was a four-level enhancement I believe that I

17  sustained the objection to, is that correct, on the

18  sadistic conduct?

19          MR. BUGNI:  Yes, Your Honor, that's correct.

20          THE COURT:  Okay.  So let's see.

21          MR. BUGNI:  It won't actually matter, Your Honor.

22          THE COURT:  It won't matter because we have 51.

23  If we take four away, then that's 47.  We can only go as

24  high as 43.  So the ultimate effect on the guideline is

25  immaterial.

12

1          MR. BUGNI:  I'm sorry, Your Honor.

2          THE COURT:  I'm sorry?

3          MR. BUGNI:  We had 51 in the original --

4          THE COURT:  Yeah.

5          MR. BUGNI:  -- but I believe we have 47 in the

6   revised PSR.  It would still only --

7          THE COURT:  Reduce to a 43.

8          MR. BUGNI:  That's right, Your Honor.

9          THE COURT:  So we would reduce to 43 then.  With

10  a criminal history category III, the advisory guideline

11  imprisonment range would still be life.  And then given

12  the statutory maximum 30 years on the possession charge,

13  ten years on the -- I'm sorry, 30 years on the production

14  charge, ten years on the possession charge, gives us a

15  40-year statutory maximum which then becomes our guideline

16  calculation.

17     So, Ms. Altman, are you in agreement where we land in

18  the guidelines?

19          MS. ALTMAN:  Yes, Your Honor.

20          THE COURT:  Mr. Bugni?

21          MR. BUGNI:  Yes, Your Honor.

22          THE COURT:  Okay.  All right.  So that's as far

23  as the guidelines take us.  I've got sentencing memoranda

24  from both sides, so you don't need to repeat those things,

25  but let me know if there is anything further that the

13

1  parties want me to consider before I ask if Mr. Kawleski

2  has anything to say.  Ms. Altman.

3         MS. ALTMAN:  Thank you, Your Honor.  I will not

4  repeat anything hopefully or much in my sentencing

5  memorandum.  I want to comment primarily on the sentencing

6  memorandum filed by Mr. Bugni and also about the

7  defendant.  In the sentencing memorandum the defendant

8  says he should be getting punished for, quote, "getting a

9  16-year-old drunk and having sex with her," end quote, and

10 that this is otherwise isolated behavior.

11        The defendant's case and behavior in this case was a

12 lot of things: it was grooming, it was rape, it was sexual

13 assault, it was abusive conduct, it was exploitation, it

14 was forceable sexual penetration, all of those things.

15 What it cannot be called, under any stretch of the

16 imagination, is getting a 16-year-old drunk and having sex

17 with her.

18        As far as the claim in the sentencing memorandum that

19 the defendant has accepted beginning from the -- accepted

20 responsibility from the beginning, I know the Court

21 addressed it, but I think it bears repeating.  The only

22 person who's accepted responsibility for Mr. Kawleski's

23 actions in this case is Mr. Bugni, and he has done so from

24 the beginning, at least as far as the conduct that's shown

25 in the video.

1       The defendant has continued to deny responsibility

2   for the actions in this case up to and including the

3   allocution that he filed yesterday in which he again

4   blames Tracey Brown, says that he burned the thumb drive

5   at issue, that this is something that she created.  And

6   now, taking it one step further yesterday, saying for the

7   first time, at least that I recall, that she had been

8   threatening him to turn over this thumb drive since 2015.

9   So he's created this whole narrative, even as of

10  yesterday, with his allocution.

11      Touching on a few other things in the defendant's

12  allocution, everything that he says only amplifies the

13  points in the government's sentencing memorandum about his

14  history and characteristics.  It seems to be primarily

15  about how his actions have affected him.  The lack of

16  self-awareness in his allocution is staggering and is on

17  display in the very first sentence of his allocution where

18  he calls it, quote, "an unfortunate situation."  This

19  isn't an unfortunate situation.  He sexually assaulted and

20  raped a girl that he had a close relationship with that he

21  had been grooming for a period of time.

22      He claims to have made all of these changes after the

23  offense.  That may or may not be true.  It's hard to tell,

24  especially based on this allocution that he wrote, but

25  that's a very small part of this case.  He continues to

1 | challenge his conviction, as I've already indicated.  He
2 | blames Tracey Brown for all of these issues at this point.
3 | He can't even admit that the victim was unconscious
4 | because that doesn't seem to fit this narrative that he's
5 | now trying to sell.
6 | It appears, and I read this several times, I hope I'm
7 | wrong, but it appears that he's now trying to say that the
8 | conduct between him and the victim was somehow mutual.  He
9 | claims they leaned on each other.  He told her that she
10 | wasn't at fault and they mutually resolved to leave the
11 | past behind them and move forward in an appropriate
12 | manner.  That's just offensive.  That is beyond offensive.
13 | If he's now trying to say that she was some willing
14 | participant in this behavior and that they've decided to
15 | move on more appropriately, he's got bigger problems than
16 | even imagined when this case started.
17 | The victim reported not even knowing that this
18 | conduct happened.  It wasn't mutual.  She was passed out,
19 | drunk, and he violently assaulted her.  He raped her.  And
20 | if he doesn't get that, he's a tremendous danger to the
21 | community.  And if he does get that and he's just trying
22 | to manipulate the Court into this narrative that he now
23 | wants the Court to believe, he's still a danger to the
24 | community.
25 | He deserves to be out of commission for as long a

1   period of time as possible.  And at that point, based on

2   I'm not dismissing the Court's earlier decision, that's 40

3   years and the government recommends that sentence, Your

4   Honor.

5           THE COURT:  Let me ask a couple of follow-ups.

6   I'm somewhat surprised.  I say only somewhat surprised

7   because I know that this has been traumatic for Amanda,

8   but I didn't get any witness or victim statements and so

9   I'm wondering if there is anything from the victims.  So I

10  didn't get any corroboration of the apology and agreement

11  to move forward.  But I even reviewed the trial testimony

12  and that really didn't touch on any of the trauma or the

13  impact of the crime on Amanda, although I could tell from

14  her demeanor that she was upset by the whole affair and I

15  know that she said that she wasn't aware of it and she was

16  upset when she found out about it.  But I guess my

17  question is any input from the victim on any of this?

18          MS. ALTMAN:  We did not get any victim input,

19  Your Honor, we didn't.  We reached out to them.  We sent

20  them notice.  Neither one responded to either the

21  probation office or our office.

22      As far as the apology, I don't think it could have

23  happened because she didn't know about the conduct, so I

24  think that's just not even true.  But to answer your

25  direct question, no, there's no victim impact.

1          THE COURT:  All right.  Then the other set of

2    questions I have is you cited the *Irey* case -- and for the

3    benefit of the court reporter, it's I-R-E-Y -- the

4    Eleventh Circuit case.  I have to say, that case is quite

5    an outlier, both legally and factually, factually because

6    the defendant in that case engaged in very protracted,

7    ghastly conduct that involved a sadistic sexual assault of

8    at least 50 child victims, prepubescent victims, and so

9    that conduct is far beyond what we have in this case.

10          It's also an outlier in that it's one of those rare

11    decisions in which an appellate court reverses a trial

12    court's determination of a reasonable sentence.  And so I

13    wanted to ask about the cases that you cite and try to

14    understand how I'm supposed to consider them, because even

15    Mr. Irey, as ghastly as he was, he only got 30 years.

16          And some of the other cases that were cited with some

17    very long sentences from the Seventh Circuit, those were

18    upheld as reasonable sentences.  It wasn't that those

19    sentences were specifically endorsed; they were held to be

20    within the range of reasonableness.  But those too

21    involved much more serious conduct and the distribution of

22    pornography through websites directed at people who are

23    interested in that kind of thing and I don't have that

24    distribution element here.

25          And the bottom line here is that Mr. Kawleski's

 1   conduct, as bad as it was, and it was serious, just isn't

 2   in the same league as some of those other sentences of a

 3   hundred years or even 40 years in some of those other

 4   cases.

 5          MS. ALTMAN:  Well, Your Honor, there are two

 6   things.  They're cited -- *Irey* is cited a lot for the

 7   principles that, you know, we need to protect our children

 8   and do whatever it takes to protect our children.  And so

 9   when you look at that and when you look at Mr. Kawleski

10   and what he's done and his current attitude, that remains.

11   We need to protect our children.

12       As far as how it compares to other sentences, I mean,

13   his conduct -- I mean, his conduct was bad.  We don't know

14   how often he did it.  Amanda reported that she woke up

15   other times feeling sore.  I don't think that we can say

16   this is a one-time thing, particularly because had the

17   Court not dismissed the other charges, I mean, we have

18   however many charges of production now that he touched

19   them.  In the shower videos he didn't.  But it's an

20   extended course of conduct that he engaged in and I think

21   that that's something that the Court needs to consider.

22   It wasn't just a single incident.

23          THE COURT:  I definitely will consider that.  But

24   when I'm looking at points of comparison -- and honestly,

25   just let me tell you, my perspective is I'm very cautious

1    about looking at other cases that I can see only through

2    the appellate record and looking at the ultimate sentence

3    and I have a description of the offense conduct, but I do

4    not have the kind of rich information that I have when I

5    sentence somebody myself.  So I'm very cautious about

6    looking at some other case where somebody else convicted

7    under the same statute gets an extraordinary sentence,

8    because I just don't know all of the information that went

9    into that sentence.

10        And so I understand your point that I could be upheld

11   as making a reasonable determination if I did impose the

12   statutory maximum here, partly because that's a guideline

13   sentence and so it's presumed to be reasonable for appeal

14   purposes, but that doesn't really guide me to what the

15   right sentence is in this case.  And when I look at those

16   cases, I see very much more atrocious behavior in most of

17   them.

18            MS. ALTMAN:  Well, I think, Your Honor, then if

19   you don't consider those other cases and you want to look

20   specifically at what this defendant did, and we do

21   encourage that in the sentencing memo -- I think it

22   says -- I know that it says "understanding that you're

23   sentencing this defendant for these actions" -- I think he

24   still warrants that type of sentence.

25        He engaged in -- I know he denies it, but it sure

1  seems like he's engaged in this conduct before with

2  multiple girls.  He had a daughter who was coming into

3  that sort of age.  I'm not saying he did anything at all

4  with her, but that was possibly coming up next.  He took

5  numerous videos of the victim in this case.  He seemed to

6  be obsessed with her.  He created videos about her.  He

7  continues to deny his responsibility.  He has complete

8  lack of self-awareness.  He's only interested in himself

9  and how this has affected him and his reputation.

10      So if you disregard all of those other cases and just

11  look at this case and what you have in front of you and

12  the things that you should look at, he still warrants a

13  really really really long sentence.

14          THE COURT:  All right.  Mr. Bugni.

15          MR. BUGNI:  Thank you, Your Honor.  I think I'm

16  going to begin with where Ms. Altman began and that is my

17  sentencing memo.  I was a little concerned if I would have

18  actually written that in the sentencing memo, because it

19  has a tin ear, but I'd like to read what I actually wrote

20  in my sentencing memo.  "Getting a 16-year-old drunk,

21  having sex with her, and then later secretly videotaping

22  her in the shower is absolutely repugnant."  That's my

23  quote.  That's exactly what I said when I wrote it on page

24  2.  And that's the way this case is, it's very difficult

25  and it's very atrocious.  It is atrocious.  I've never

1 backed away from that.

2     But where do we punish a person who's engaged in this

3 and I think the Court has asked.  We can look at other

4 circuit cases, we can look at court of appeals cases.  But

5 I can just look at the other cases that I've appeared

6 before you with, but I don't really think that's very

7 helpful, like John got X and so I want X minus two or X

8 plus two.

9     But I would look, Your Honor, at Steiskal, the man

10 raped a 10-month-old and then sent it to another minor, 15

11 years.  I'd look at John Gilbert, had sex with a

12 16-year-old multiple times, arranged gang bangs,

13 videotaped it, sent it to other people and then also

14 videotaped himself with another girl or took photos, 10

15 years.  I'd look at Raimondi, who molested a

16 seven-year-old, 12 years.  I'd look at Hosler, who

17 traveled here from Texas to have sex with a 10-year-old

18 that he was going to purchase -- or 12-year-old, sorry,

19 that he was going to purchase and then videotape it, 10

20 years.  So when you look at like what's a reasonable

21 sentence here --

22         THE COURT:  I would add to that inventory Leroy

23 Bond, 25 years.

24         MR. BUGNI:  I think that was a little

25 distinguishable, Your Honor, and I would put that

distinguishable on three levels.  One, he was very scary
in that he had done it to multiple girls.  There was the
seduction there of the -- I don't know the right -- the
girl with mental disabilities.  That was a real driver
there.  You know, she was 14, she was slow.  I don't
remember if she had Down syndrome or what it was, but she
was mentally -- she had mental impairments.  There was
also getting the girl drunk and taking her virginity at
the party.  That was just atrocious.  And then there was
the escalating abuse there as well as he was out of
control.  So Leroy Bond, at 25, he's very distinguishable.

        And, Your Honor, when I wrote in my sentencing memo
that if he would have been caught in 2015 or 2014 or 2013,
I think you would have really -- I think you probably
would have gone north of 15 years, I really do.  I've
appeared before you enough and I think Leroy Bond kind of
lingered in my head.  I saw this as like a 17-year case.
I'd still ask for 15, but I think that would be
reasonable.  I would say that in *Leroy Bond* I asked for
18.  I asked for an entire -- you know, I think I called
it like an entire lifetime as a juvenile.

        But here you have Kawleski turning the ship.  And I
do not discount that he was a dangerous, out-of-control
person in 2013 and 2014, but 2015 he makes a change.  And
we can look at this circumstance of specific behavior that

1  is spanning that time -- huge alcohol issues, a

2  deteriorating relationship and just creeping behavior,

3  sexually inappropriate behavior -- all of it terrible and

4  that calls for certain punishment.  But now we've removed

5  it five years -- really seven years now if we take the two

6  years, you know, we're past this -- and we have a

7  different person and you're going to drive home a message.

8       And I hope you at least acknowledge the instrumental

9  goals of sentencing.  This isn't really about having to

10 keep society safe as much as a Leroy Bond case and it's

11 not about deterrence.  This isn't somebody who we have the

12 inklings that he's going to go back to this sort of

13 behavior.  I just don't see that.

14      I agree that there's troubling behavior and it's

15 criminal behavior in 2013 and 2014, but after that you

16 have that complete absence.  If he really is that immersed

17 in this, then there's going to be fragments of it.

18 There's going to be something that would show up in all of

19 the downloads and all of the investigation that the police

20 did, something -- some interest in children, some other

21 victim speaks out, something -- but it's not there.  And

22 it goes to the credit of his consistent story about what

23 was going on in his life.

24      Now, Your Honor, I think lingering in all of this is

25 whether or not you believe him, if you believe him that he

1    threw out the flash drive.  I can only say that's been the

2    story from day one.  Do you believe him that he apologized

3    to Amanda?  Like that's been his story since day one.  "I

4    was out there, a cigarette, she was going to move back

5    in."  You know, "It was terrible.  It was the worst time

6    of my life.  I've apologized to her twice," and they

7    resolved never to speak of it again.

8         Now, there are two aspects of it.  You can look at it

9    and say is it only this one time that I'm punishing, this

10   one time that he got her drunk and sexually assaulted her,

11   or was there something greater going on, something even

12   more nefarious, but something that he also turned his back

13   on, and that's what the more troubling is.  Because if

14   he's apologizing twice, you're apologizing for something

15   that somebody has no memory of, you're apologizing for

16   something that you know deep down what you did is wrong

17   and another person knows what you did is wrong, that's

18   what he's been consistent in and that actually fits with

19   everything else in this case.

20        I only cite two other parts of it, Your Honor.  One,

21   the last time we have anything on that flash drive is 2015

22   and that was with -- that was early 2015 with the adult

23   pornography that had been put on there.  Second, we have

24   someone who has every aspect of desiring to be an

25   exceptional father.  And I'm not saying like -- he had a

1  stepfather relationship with Amanda.  And I agree that's

2  just horrendous.  It's so frickin terrible what he did.

3  But you have this complete immersion in his children's

4  life and everybody agrees about that, that like this is

5  somebody who put away the alcohol, who put away all the

6  distractions, who put away those aspects of it and was

7  trying to be something for them in the midst of now being

8  a single father.

9        And you have to ask yourself, is there the

10  possibility that he was able to right the ship without

11  getting caught and without that punishment.  And then ask

12  yourself the deeper question, and I think this is what

13  drives it, Your Honor -- I don't know what you would give

14  if you could go underneath 15 years.  I don't even know if

15  you're going to go under 15 years.  I'm hoping you are --

16  but could he have righted that ship and, if so, what would

17  he feel in the midst of having that brought back up.

18        He's turned his life away from the very worst thing

19  that he ever did, that anyone could ever do, put it behind

20  him, and then it's brought out and he's facing the

21  consequences as a new man.  And in facing the consequences

22  as a new man, this is what we have: an apology, we have no

23  other evidence of child pornography, we have nothing else

24  touching that flash drive, and we have his remorse.

25        And one other thing -- I wish I would have said this

1   when you said the acceptance of responsibility -- now part

2   of it is this man has cried more and shown more remorse,

3   and not in a manipulative way, but in a "Holy cow, the

4   whole world is crashing down on me" way.  That's been

5   consistent through the bond hearings, through every aspect

6   of this, through the trial.  You saw it.  We had to

7   continue trial for three hours so he could compose

8   himself.  This is somebody who's racked with his life that

9   he thought he had turned away from and the life he was

10  going towards is completely ripped away.

11      I would add only one other comment to what you had

12  said earlier.  Your Honor, I've tried enough cases before

13  you.  You know I wouldn't want to put a victim on the

14  stand.  We offered to stipulate to have, you know,

15  whatever they needed.  We did not want them on the stand.

16  And it was not because it would further our defense or

17  take away from our defense.  Our defense was what it was.

18  We won 15 counts or 14 counts.  But this was not something

19  that he took any joy in having them testify or there was

20  any other aspect to it.  He wept throughout that.

21      Your Honor, you're looking at somebody in a very rare

22  position: being caught six years after the worst thing he

23  ever did.  And I ask you, when you're judging the moral

24  and the instrumental goals of sentencing, to think deeply

25  about that, to think deeply about like has this man really

27

1  changed and does it need to be a day over 15 years.   I
2  think that somewhere along the line he's paid his debt and
3  it doesn't have to be 181 months.   180 months more than
4  fits that bill.

5          THE COURT:  Let me ask you a couple of questions.
6  You said that Mr. Kawleski has turned his life around, put
7  away the drinking.  But in his residence, after the
8  search, they found marijuana and cocaine in his residence.

9          MR. BUGNI:  Yes, sir.

10         THE COURT:  He didn't -- you could say it got
11 worse.  Now that he doesn't drink, he uses hard drugs.

12         MR. BUGNI:  He did admit to using cocaine with
13 Tracey Brown I think twice in the PSR.  I don't have the
14 exact paragraph.  You know, I tend to think -- I think
15 cocaine is a bad drug, but I would think drinking out
16 blackout drunk is a little bit more dangerous.  As far as
17 marijuana goes, he shouldn't have had marijuana.  But I
18 meant it on the spectrum of he put away the alcoholism
19 that was defining his life and getting drunk with a
20 16-year-old, doing that behavior, also like ramming his
21 car into someone.

22         THE COURT:  As I understand your -- the core of
23 your argument is that this was aberrant behavior and it
24 was driven by a dark moment in his life.  But you have to
25 look to 2009.  He's got a conviction for sexual contact

1  with a minor in 2009.  He denies it now, but he pled

2  guilty to it.  And so I know there's an excuse for it, he

3  offers a justification, but that is a huge dent in his

4  credibility.

5           MR. BUGNI:  Yes, that is.  And I'll just -- can I

6  make two observation that I probably should have done

7  earlier?  One, he pled no contest.  It's different than

8  federal court where you've got to eat it and you've got to

9  say what you did.  You know, you can say, "I plead no

10 contest, Your Honor."

11      Second, if the government -- you know, the

12 government's sentencing memo is really "Look, 2005 he did

13 this.  She wrote it in her diary."  But when I went to the

14 discovery this morning, and they say it in their

15 sentencing memo, "She ripped out the pages."  But then in

16 2009, the friend who, you know, accused him said, "I saw

17 the diary.  I saw that."  Well, if, in 2005, the cops

18 couldn't find it, I don't think in 2009 that victim

19 found it.

20      But I'd also put in this: If those things happened,

21 what is he doing getting a fourth degree sexual assault?

22 What is he doing getting two years probation and

23 conditional jail time, meaning he didn't even actually

24 have to sit in jail?  Like if those things really

25 happened, the DA up there knows how to hit him.  The DA

1  there has to answer to the people.  And if the DA really

2  believed that he had done these things, that he was that

3  predator, then he would have actually -- he or she would

4  have actually really hit him.

5       Now, I'm not saying that he's the most credible

6  person, that, you know, you're going to believe him to the

7  bank, but his story does make sense and there is a lot of

8  evidence to support it.

9            THE COURT:  Well, there's also evidence going the

10 other way, because in 2009 Amanda corroborates the

11 friend's claim of victimization.

12           MR. BUGNI:  Your Honor, that's what's in the

13 police report.  If that really held up, then what's that

14 DA doing?  Why not actually push that?  There are lots of

15 cases --

16           THE COURT:  Because cases like that are hard to

17 win.

18           MR. BUGNI:  I don't know if they are that hard to

19 win.  If the facts were that clear, then that's not a hard

20 case to win.  That's whether did he actually come in

21 there.  "I have two witnesses who say he did."

22           THE COURT:  All right.  How about this: He didn't

23 want to put the victims on the stand to have to go through

24 it.

25           MR. BUGNI:  There could have been lots of

1   reasons, Your Honor.  But if he was that bad a dude, then

2   you would actually push it and you would do it.  And us

3   hypothesizing now, you know, about whether it did or

4   didn't happen, how much more of a sentence does that

5   aggravate?  If this would have been close together and

6   there hadn't been that six-year break, I'd say yes, Your

7   Honor, you have legitimate concerns.  But those legitimate

8   concerns I think are wiped away around year '13, '14, '15.

9        But is this aberrant behavior?  Maybe even within a

10   time period of his life, from 2009 to 2014, I give you

11   that.  He's hell on wheels.  He's terrible.  But 2014 to

12   2019 he's doing great, five years of entrenched every day

13   getting up and going to work, five years of taking care of

14   those two kids.  That speaks as loud or louder than those

15   five years of aberrant behavior that are really rooted in

16   a dysfunctional relationship and alcoholism.

17             THE COURT:  Anything else?

18             MR. BUGNI:  Unless you have other questions, Your

19   Honor, I think Mr. Kawleski has a few words.

20             THE COURT:  Okay.  Mr. Kawleski, you've got the

21   right to address me before I decide on your sentence.  You

22   don't have any obligation to say anything, but I'd be

23   eager to hear from you, so go ahead.

24             THE DEFENDANT:  Your Honor, I guess I don't

25   really know what to say.  I mean, I want to say I'm sorry

1  to everybody, Amanda and Kya, Noah and Emma -- I love you

2  more than everything in the world -- my mom, Keith, Ethan

3  and Evan.  I miss you all so much.

4      I can't deny, you know, what I did.  I feel

5  absolutely disgusted by it.  And I've been trying to get

6  past that in working to put that behind me.  But I'm

7  sorry, everyone, I'm sorry.  I don't know what else to

8  say.  My mom, Ethan, Noah and Emma, my dad too, I love you

9  all so much.  I'm sorry I let all of you down.  I tried.

10  I tried so hard to get away from that.  That's why it's

11  hard for me to talk about it now, because I hate that part

12  of me.  I don't know what else to say.

13          THE COURT:  All right.  Anything else or are you

14  finished?

15          THE DEFENDANT:  No, I'm -- thank you.

16          THE COURT:  All right.  I'm going to take a

17  recess here for a few minutes and then we'll come back and

18  finish up the sentencing, so just hold on for a few

19  moments.  Thank you.

20      (Brief recess.)

21          THE COURT:  All right.  I'm going to organize my

22  comments along the lines of the 3553(a) factors.  We've

23  discussed the case extensively.  We've all been dealing

24  with it for a long time.  I think we're all very familiar

25  with the basic facts, but I have to start out with the

 1  characterization of the offense.

 2      This is a sexual assault of a minor.  She was

 3  unconscious.  She was in a stepdaughter-like relationship

 4  with the defendant.  That is a very serious offense.  And

 5  the insult to the victim was greatly amplified by the

 6  defendant making a video recording of it and by his

 7  preservation of that video for an extended period of time,

 8  even if I credit his explanation that he thought he got

 9  rid of it in 2015.  I'm skeptical of that because of the

10  existence of the flash drive that was charged in this

11  matter.

12      I don't have very direct evidence of the trauma to

13  the victim.  I think it was traumatizing.  I can

14  understand the betrayal that the victim justifiably feels.

15  Mr. Kawleski should have been her protector.  They were

16  all going through a traumatic period when Theresa was

17  abusing alcohol and was in a very bad state.  Amanda

18  should have been able to lean on Mr. Kawleski and he

19  betrayed that very fundamental trust.  It's really -- it

20  is an atrocity, I have to agree with that, but I don't

21  have further statements about the trauma to the victim.  I

22  recognize that it's there, but I don't have the details

23  there.

24      I will observe that there was no distribution of the

25  video, which sets this case apart from many of the others

1   that garnered sentences of several decades in which
2   somebody not only went through the kind of experience of
3   being sexually assaulted and photographed, but then the
4   photographs were distributed widely.  So that is a very
5   big difference between this crime and the many that are in
6   the cases that were cited to me.

7        Turning to the defendant, I think I need to make this
8   observation, that he is not a pedophile.  He is not
9   attracted to prepubescent children.  And that puts him in
10  a different category because pedophilia is a much more
11  intractable disorder and therefore it poses a greater
12  threat to more vulnerable victims.

13       And so I think it's important when Mr. Kawleski says
14  he doesn't want to be lumped in with the more violent
15  pedophiles.  He has a point.  He's not in the same
16  category as some of the offenders that are in the other
17  cases who have sexually abused prepubescent children, you
18  know, some very young ones.

19       But that's not to diminish the risk that the
20  defendant poses because of his sexual interest in underage
21  girls.  I've got other offenders that I've sentenced and
22  have to supervise and an interest in underage victims is
23  itself an enduring difficulty that poses a great risk to
24  vulnerable victims, not as vulnerable as those that are
25  the objects of the pedophile's attention, but it's just --

1  it's a different category.  It's still a problem.

2       As I said, the defense's main argument is that the

3  crime was an aberration from a dark period.  I'm just

4  simply not completely persuaded by that.  I don't find

5  Mr. Kawleski really an entirely credible historian.  I

6  don't begrudge him his degree of self-pity.  I think it

7  would take an act of super-human selflessness not to think

8  about what's in his future when he's facing a 15-year

9  mandatory minimum and a guideline sentence of 40 years.

10      So I understand his regret over the entire situation

11 and the impact that it will have on him and his family.

12 That doesn't mean that he doesn't have remorse over it.

13 And I think it's very understandable that a lot of what

14 he's concerned about is what is happening to him or what

15 has happened to him.

16      It's important to just make it crystal clear,

17 however, that we are only here in this unfortunate

18 situation because of his conduct.  He is the one that put

19 us all here.  He put the victims here, he put all of us

20 here, he put his family here, he put his children here.

21 It's all on him.  He is the only person who really did

22 anything wrong and really bears any responsibility for

23 this.

24      And he can resent Tracey Brown for bringing that

25 evidence to the police.  But whatever her motivations are,

1   she brought the truth to light.

2       The defendant acted on his attraction to minors over

3   a period of years.  I think there's pretty good evidence

4   of some sexual touching of Amanda as early as 2005.  But

5   we've got the prior offense to another victim in 2009.  He

6   pled to it, he pled no contest.  And he denies it now, but

7   I think there's pretty good evidence to believe that that

8   took place.

9       And then we've got the sexual assault of Amanda.  But

10  then we've got the surreptitious videos that were made

11  over a period between 2013 and 2014.  And he manipulated

12  those videos and the video that he made of the sexual

13  assault of Amanda and preserved them at least until 2015,

14  and that's crediting his purported destruction of them.

15      And so he wasn't convicted of any federal crime on

16  the basis of the bathroom videos, but it demonstrates a

17  couple of things.  One, this is an enduring pattern of

18  misconduct driven by a sexual interest in underage girls

19  and it demonstrates his complete willingness to take

20  vulnerable people close to him, who depended on him, and

21  use them for his own purposes, either without --

22  completely without their awareness.  It is an extremely

23  manipulative and heartless thing to do.

24      And so to me, I have a hard time accepting that this

25  was just an aberration that was driven by a breakup.  I'll

1   also note this: Going through a bad breakup and having the

2   trauma of having a person that you love kill themselves

3   through alcohol abuse is very traumatic and it might lead

4   one to their own drug abuse.  But the expression of that

5   trauma of his own to turn to sexual abuse of his

6   stepdaughter or the person in his stepdaughter-like role

7   is really atrocious.  I don't find that really much of a

8   mitigating factor at all.  She was going through a trauma

9   at the same time.  And as far as I'm concerned, it appears

10  that that's part of what he took advantage of.

11      The crime did go undiscovered for several years and

12  he claims to have turned his life around.  I agree that

13  there's no evidence of any further sex offenses after --

14  in the last few years and so I'm not going to speculate

15  that there were other victims.  I have absolutely no

16  evidence of that.

17      But as I pointed out, when he was arrested, there was

18  cocaine, drug paraphernalia, marijuana.  And substance

19  abuse is offered as one of the drivers of his misconduct

20  of his crimes in the 2013 to 2015 range because of the

21  difficulties he was going through.  Well, his substance

22  abuse is going, you know, going forward with other drugs

23  and so I think that represents a continued risk factor.

24      As I said, I don't hold it against him that he

25  expresses regret and concern for his own well-being

1  because of the punishment that he's facing.  I take it --

2  I do believe that he sincerely regrets that what he did,

3  but that doesn't mean that he's not capable of repeating

4  it.

5       So I have to come up with a sentence that serves the

6  needs of sentencing.  I agree with Mr. Bugni that

7  promoting respect for the law, providing just punishment

8  and reflecting the seriousness of the offense is a primary

9  driver of the sentence here.  It's not mere

10  vindictiveness.  I think it's part of justice because it

11  reflects the harm to the victims and demonstrates that the

12  crime has been taken seriously.  The sentence does have to

13  be a fair one so it's not out of line with the offense

14  itself and I will acknowledge that the mandatory minimum

15  is itself quite a long sentence.

16       I'm not persuaded by Mr. Bugni's argument though that

17  deterrence is not a factor here because I do believe that

18  looking at the evidence in the case as a whole, there's a

19  strong indication that Mr. Kawleski is attracted to

20  underage girls and that he's acted on it in the past and

21  not just in the occasions that we saw recorded in the

22  videos that were presented.

23       And so I think that there is a need for specific

24  deterrence, which dovetails with the consideration of

25  whether there's a need to protect the public.  My concern

1   that he has this interest that he's acted on in the past,

2   regardless of his regret of his crimes, means that I think

3   there's a concern that he might reoffend.  I am not at all

4   persuaded that this is a case in which deterrence is

5   irrelevant.

6       Sex offender treatment is available in prison just

7   like it's available outside of incarceration, so the need

8   for treatment provides no basis for not imposing a term of

9   incarceration.  He can get the treatment that he needs in

10  prison.  Sentences available require me to impose a term

11  of incarceration of at least 15 years, so the term is

12  really what is at issue.

13      Let me say a few words about the guidelines.  I've

14  said it before, I'll repeat it here again: I disagree on

15  policy grounds with the pornography guideline for two

16  reasons.  It's not driven by empirical research on the

17  historical practices of sentencing; it's driven by

18  congressional concern about the seriousness of child

19  pornography.

20      Everybody in the world agrees that it's a serious

21  offense, but they are mandating that the sentences be

22  driven by the mandatory sentences that they've -- the term

23  of incarceration.  The maximum term and the mandatory

24  minimum terms doesn't mean that those sentences are going

25  to be effective at all.  And there's no empirical research

1  that suggests that these guideline sentences have been

2  vetted in any way or verified in any way to actually be

3  effective deterrence and so it really is an aberration in

4  the way the guidelines are usefully developed from

5  historical sentencing practices.

6      I also disagree with the guidelines' focus on general

7  deterrence.  I think that, as a general matter, I have

8  qualms about whether there's any good evidence that

9  criminal activity is really subject to deterrence on the

10  basis of the length of sentence.  All of the research that

11  I have tracked and followed suggests that the certainty

12  and swiftness of punishment has a deterrent effect, but

13  the actual sentence length really does not.

14      There's recent study from the Sentencing Commission

15  trying to correlate recidivism and length of sentence and

16  they came up with the barest of correlation that suggests

17  that longer sentences are a slight specific deterrence.

18  There's nothing to support the idea of general deterrence

19  other than a general idea that criminals engage in some

20  sort of cost-benefit analysis in which they factor in the

21  length of sentence they might receive in their conduct.

22  Well, I think this case demonstrates a pretty good example

23  of how the individual decision-maker just doesn't engage

24  in that kind of decision-making, so I don't think the

25  sentence I impose here today will have the slightest

1    impact on anyone else.

2        I do think that it's important to send a message that

3    we have taken the crime seriously to reflect the victim's

4    experience and that we take it seriously, but the idea

5    that this will have an actual deterrent effect on some

6    other person who's going to sexually assault someone I

7    think is very unrealistic.

8        I'll also note this, that the pornography guidelines

9    are very concerned with the pornography market and that's

10   just not a factor here, because there was no distribution

11   of the pornography in this case, so this isn't a case in

12   which we're trying to accomplish drying up the pornography

13   market by sentencing Mr. Kawleski.

14       The sentencing disparities I think really are an

15   important factor here because in the absence of useful

16   guidance from the guidelines themselves, I do have to look

17   at comparable cases and sort of see what makes sense, what

18   seems fair, because it's appropriate to consider other

19   victims.

20       And I will note that I thought of both Mr. Bond and

21   Mr. Gilbert as points of comparison because they involved

22   teenage victims.  And Mr. Gilbert really got a very short

23   sentence for his conduct.  Partly it's driven by factors

24   that aren't really the offense itself, but the individual

25   characteristics of the defendant.  But he got ten years.

1  Mr. Bond got 25 years.

2       I think I disagree with Mr. Bugni that the cases are

3  so remarkably different.  There are of course points of

4  distinction with all of these cases.  But just in terms of

5  rough measures, I think I've got to be -- if Mr. Bond gets

6  25 years, I don't think it would be appropriate for

7  Mr. Kawleski to get 40 years.

8       Restitution I don't believe is an issue here because

9  I've got to give him at least 15 years, so I don't think

10 whatever extra time that I add to it would affect the

11 likelihood of any restitution being paid.

12      So when I balance all of those factors, I think that

13 I tried to slot Mr. Kawleski into as appropriate a spot in

14 the spectrum of child pornography defendants that I have,

15 I think a sentence of 18 years is appropriate.  I think

16 it's more than the mandatory minimum and it's driven

17 upward by his history of a prior sex offense and the

18 enduring nature of the offense conduct that I have here:

19 That he preserved those photographs, manipulated them and

20 kept them -- or the videos, I should say.

21      If there were a more robust statement of

22 victimization, if the crime itself were even more

23 catastrophic than I think it is, I might have been

24 inclined to go longer.  And again I don't mean to diminish

25 the experiences of the victims.  I want them to feel that

42

1  justice has been done as well.  That's an important part

2  of what I'm trying to accomplish here today.

3      But I hope they understand they did nothing wrong and

4  I hope that they move on and recognize that their being

5  taken advantage of by Mr. Kawleski should be a small part

6  of their lives going forward.  Unfortunately, it is often

7  not the case, that it ends up with an enduring inability

8  to trust people because someone so close to you has

9  betrayed a trust so important, as Mr. Kawleski did, but I

10  hope that they can keep it in perspective and move

11  forward.

12      So the sentence I impose is 18 years of

13  incarceration.  That will be followed by 20 years of

14  supervised release.  A long period of supervised release

15  is necessary to make sure that Mr. Kawleski doesn't act on

16  his attraction to teenage girls again and so I impose a

17  long period of supervised release.  But I think 20 years,

18  combined with the period of incarceration, will be

19  sufficient to protect the public.

20      Ms. Altman is correct that nothing is as protective

21  as incarceration.  But I believe that the 18 years of

22  incarceration is an appropriate period to have that kind

23  of protection and 20 years of supervision provides the

24  remaining reduction of the risk.

25      So we haven't gotten any specific requests for

1  restitution.  Mr. Bugni presents in his brief that the

2  offense was committed before the effective date of the

3  statute that would require the mandatory restitution.

4  Ms. Altman, do you agree with that?  Is that off the table

5  now?

6          MS. ALTMAN:  I do agree with that, Your Honor.

7  And I would also add, even if it were post statute,

8  without a request, the mandatory doesn't apply.

9          THE COURT:  All right.  And so I don't believe

10  I've got even a suggestion that I've got restitution

11  coming and so I don't see any need to order restitution

12  then.  Is that correct, Ms. Altman?

13          MS. ALTMAN:  That's my understanding, Your Honor.

14          THE COURT:  Okay.  So I will order no

15  restitution.  Let's see.  Might as well address the

16  objections to the conditions of supervision.  The bottom

17  line is that I think they're all justified and there are

18  no prohibitions of anything that Mr. Kawleski might

19  actually want to do, like travel outside the district.

20  It's just that he has to disclose it and get approval.

21  And so, for example, I won't overrule that one because I

22  think it's a very important part of monitoring of most

23  defendants, but particularly one with who's conduct is

24  surreptitious.  And so I think knowing where Mr. Kawleski

25  is I think is an important part of supervision, so that's

1  overruled.

2      Concerning Condition No. 10, I think that's the work

3  as an informant.  The only way that Mr. Kawleski could

4  work usefully as an informant, it seems to me, is in an

5  investigation of a child pornography offense.  And if that

6  would happen, I would want to know about it, I would want

7  a supervising officer to know it, so there is no reason

8  not to impose the condition that he not work as an

9  informant without getting approval first.

10     The restrictions on his devices, I think that in this

11 day and age it's almost necessary as a condition of life

12 that you have a device that records video and audio and I

13 do not mean to prohibit this from Mr. Kawleski.  But just

14 as it's almost an unavoidable feature of modern life, it

15 also unavoidably provides Mr. Kawleski the opportunity to

16 reoffend.

17     And so I do not anticipate and expect that he will be

18 deprived of normal existence in the modern world after his

19 term of incarceration, but I do think that it's critically

20 important that if he has audio or recording devices that

21 we know what they are and so I think that's an important

22 point of supervision.

23     I will overrule the objection to the polygraph.

24 They're not admissible as evidence in court, but they are

25 a useful supervision tool.  To put it really succinctly,

1   it keeps people under supervision for sex crimes honest if

2   they have to face a polygraph examination and so I think

3   that is an appropriate condition as well.  The conduct was

4   localized to Amanda and her friend on the shower videos,

5   but we had a prior offense that he pleaded guilty to as

6   well and so I'm going to recommend that.  I'm going to

7   impose that condition as well.

8       At this point I'm not going to limit it to female

9   minors.  I agree there's no suggestion that he has any

10  interest in boys.  But that gets to, in my mind, a very

11  fine-grained distinction that if you're involved with

12  activities with minor boys, it's quite possible that

13  somewhere in the area minor girls will be there, too.  And

14  again there's no prohibition, absolute prohibition, but it

15  requires disclosure, consent and approval.

16      And Condition No. 21, the same logic applies to

17  Condition No. 21 about work where there are children under

18  the age of 18, so that objection is overruled as well.

19      I will ask whether there are any further objections

20  and whether Mr. Bugni and Mr. Kawleski would like me to

21  read the rest of the conditions into the record.

22  Mr. Bugni.

23          MR. BUGNI:  No, Your Honor.  We would waive

24  reading and we have no further objections other than those

25  previously stated.

46

1          THE COURT:  All right.  Mr. Kawleski, I'll say

2    two more things about the conditions.  They can be

3    adjusted.  During your supervision, if you make a motion

4    to the Court, we will reconsider those conditions at the

5    time or before you begin your supervision.  The government

6    or the probation office also can make a request to modify

7    the conditions, so they can be changed.

8          I'll also say this, that supervision is not designed

9    to trip you up and send you back to prison.  It's there to

10   monitor your compliance with the conditions and to ensure

11   that you engage in a law-abiding life, but it is not

12   designed to trip you up and send you back to prison.  So I

13   hope you'll undertake your supervision with that

14   perspective as well.

15         Drug testing is addressed in Condition No. 14.

16         It is adjudged that the defendant is to pay the

17   mandatory criminal assessment penalty of a hundred dollars

18   per count, in the amount of $200, to the clerk of court

19   for the Western District of Wisconsin immediately

20   following sentencing.

21         I do find that the defendant does not have the means

22   to pay a fine without impairing his ability to support

23   himself upon release from custody, so I impose no fine.

24         I will grant a final order of forfeiture for the

25   property seized from the defendant as reflected in the

1 forfeiture order.

2       And I think the special assessment, was that also

3 past, post, the commission of this crime?

4             MS. ALTMAN:  Yes, Your Honor.

5             THE COURT:  All right.  So there's no need to

6 consider the $5,000 assessment.  I note that Mr. Kawleski

7 is at this point indigent as well.

8       All right.  Probation should notify local law

9 enforcement agencies and the state attorney general of the

10 defendant's release to the community.

11       And, Mr. Kawleski, you've got the right to appeal

12 your conviction if you think your conviction was somehow

13 unlawful or incorrect.  You've got the right to appeal the

14 sentence I've just imposed if you think the sentence is

15 contrary to law in some way.  But if you want to appeal,

16 you have to do it within the deadlines, and that means

17 within 14 days of entry of judgment in this case or within

18 14 days of any appeal by the government if the government

19 were to appeal.

20       And if you can't afford the filing fee for the

21 appeal, you can apply for leave to appeal

22 in forma pauperis, which means without paying the filing

23 fee.  And if you cannot afford an attorney, you can apply

24 for court-appointed counsel to represent you in the appeal

25 at government expense.

1        I will recommend that you be afforded prerelease

2   placement in a residential reentry center with work

3   release privileges.  I will also recommend that you

4   undergo sex offender treatment programming and I will also

5   recommend that you participate in vocational programming.

6   I think that will help you make your way in the world

7   after you have completed your sentence.  I'm recommending

8   that because I don't see a really well-defined skill set.

9   I know you were employed, but I think the development of

10  additional vocational skills I think would be useful to

11  you, because you will face the additional burdens of

12  entering the job market as a felon.

13       So with that, I think we have completed everything,

14  but let's check in.  Ms. Altman, is there anything else we

15  have to address?

16            MS. ALTMAN:  No, Your Honor.  Thank you.

17            THE COURT:  Mr. Bugni, anything else?

18            MR. BUGNI:  Two things, Your Honor.  Would you be

19  so kind as to recommend RDAP as well with the vocational

20  training?

21            THE COURT:  I will also recommend the substance

22  abuse assessment and appropriate treatment along with

23  RDAP, if he qualifies and he's interested.

24            MR. BUGNI:  And the second thing, Your Honor, I

25  never know if this actually helps at all, but Mr. Kawleski

1  hasn't seen his children in two years.  If we could just

2  have a recommendation of within 500 miles.  I never know

3  if it really helps, but I'm sure it would alleviate the

4  family's concern.

5           THE COURT:  I will recommend that Mr. Kawleski be

6  placed as close as possible to his family, consistent with

7  his security and his programming needs, but I would like

8  him to be as close as possible to his family.  I think the

9  BOP does consider that, but I will add my endorsement to

10  it as well.

11           MR. BUGNI:  Thank you, Your Honor.

12           THE COURT:  All right.  And, Ms. Stieve, is there

13  anything else you think I should address?

14           OFFICER STIEVE:  No, Your Honor.  Thank you.

15           THE COURT:  Thank you all.

16        (Adjourned at 2:49 p.m.)

17                              * * *

18

19

20

21

22

23

24

25

1          I, CHERYL A. SEEMAN, Certified Realtime and Merit

2   Reporter, in and for the State of Wisconsin, certify that

3   the foregoing is a true and accurate record of the

4   proceedings held on the 28th day of January, 2021, before

5   the Honorable James D. Peterson, Chief Judge of the

6   Western District of Wisconsin, in my presence and reduced

7   to writing in accordance with my stenographic notes made

8   at said time and place.

9   Dated this 2nd day of March, 2021.

10

11

12

13

14

15                        /s/
                 _____

16                 Cheryl A. Seeman, RMR, CRR
                   Federal Court Reporter
17

18

19

20

21

22
    The foregoing certification of this transcript does not
23  apply to any reproduction of the same by any means unless
    under the direct control and/or direction of the
24  certifying reporter.

25