```
                    UNITED STATES DISTRICT COURT

                 FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

              Plaintiff,

    vs.                             Case No. 19-CR-025-JDP

ALEXANDER KAWLESKI,                 Madison, Wisconsin
                                    July 15, 2019
              Defendant.            8:45 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

   STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF JURY TRIAL
                    (MORNING SESSION)
      HELD BEFORE CHIEF JUDGE JAMES D. PETERSON
```

APPEARANCES:

For the Plaintiff:

    Office of the United States Attorney
    BY: ELIZABETH ALTMAN
        LAURA PRZYBYLINSKI FINN
    Assistant United States Attorneys
    222 West Washington Avenue, Suite 700
    Madison, Wisconsin  53703

For the Defendant:

    Federal Defender Services of Wisconsin, Inc.
    BY: JOSEPH A. BUGNI
    Madison Branch Office
    22 East Mifflin Street, Suite 1000
    Madison, Wisconsin  53703

```
              CHERYL A. SEEMAN, RMR, CRR
                Official Court Reporter
             United States District Court
           120 North Henry Street, Room 410
              Madison, Wisconsin  53703
                   1-608-261-5708
```

Also Present:

    Alexander Kawleski, Defendant

    Detective David Bailey, Wisconsin Rapids
      Police Department

    Megan Diermeier, Legal Intern

**I-N-D-E-X**

|  | PAGES |
|---|---|
| CONFERENCE | 2-8 |
| VOIR DIRE *(Noted being held.)* | 11 |

\*\*\*

THE CLERK: Case No. 19-CR-25, the *United States of America v. Alexander Kawleski*, called for jury selection and trial. May we have the appearances, please?

MS. ALTMAN: Good morning, Your Honor. The United States appears by Elizabeth Altman and Laura Przybylinski Finn. And also with us at counsel table is Wisconsin Rapids Police Department Detective David Bailey.

THE COURT: All right. Good morning to all of you.

MS. PRZYBYLINSKI FINN: Good morning, Your Honor.

MR. BUGNI: Good morning, Your Honor. Joe Bugni appearing on behalf of Alexander Kawleski and seated at my left will be Megan Diermeier.

THE COURT: Very good. Thank you. All right.

1  So we're here for our last-minute check-in before we begin
2  jury selection. And I had revised, in what I think is a
3  substantially not substantive way, the jury instructions,
4  post-trial instructions. Of course we've got -- we'll
5  have further discussion about those before we instruct at
6  the close of the case. It's kind of the main development
7  that I think we have had since we were last together, but
8  we're here to iron out anything that we need to iron out
9  before we begin jury selection.
10      Let's begin with the government. Do you have any
11 concerns that you think need my attention this morning?
12         MS. ALTMAN: I don't know that they're concerns,
13 Your Honor, but things we want to at least alert the Court
14 of and I believe that we've talked to Mr. Bugni about all
15 of these, although maybe not this first one.
16     The way that the pretrial hearing order has been
17 revised, essentially the sanitation of the relationship,
18 is incorrect. She didn't live there at the time.
19         THE COURT: Okay. So are we talking about the --
20         MS. ALTMAN: The final hearing order.
21         THE COURT: Yes. So what document are we talking
22 about?
23         MS. ALTMAN: 47. It said, "The government may
24 present testimony that Kawleski was engaged to Minor A's
25 mother and that they lived together at the time of the

1 alleged crimes."  That's not true.

2        THE COURT:  Okay.

3        MS. ALTMAN:  She had moved out.

4        THE COURT:  That's just a clarification.  So there's nothing in the jury instructions or the voir dire that contained that information?

7        MS. ALTMAN:  I don't think so, correct.

8        THE COURT:  Okay.  So thank you for clarifying that for me.

10       MS. ALTMAN:  And along those lines then, in order to abide by the Court's order and make sure that some of our victim's time frames are based on things we don't want her saying in court, we'll attempt on leading her through that initial time-frame testimony.

15       THE COURT:  Okay.  I think that's an appropriate way to handle it, so I'll allow you to lead the witnesses on that time frame.

18       MS. ALTMAN:  And then the other final thing I think for us is that we do intend, while the videos are playing, to manually brighten them, if they need it, brighten the screens.  They have not been altered.  They have not been changed.  We indicated we would not do that, we didn't.

24    But to the extent they can be altered on our screen, the defendant of course could have altered them as well on

1 any screen he's looking at.  It's brightening in the
2 screen; it's not altering the video.
3            THE COURT:  Mr. Bugni.
4            MR. BUGNI:  That presupposes that Mr. Kawleski
5 would have the same technology in 2013 that we have in
6 2019 in like a hundred-thousand-dollar courtroom, probably
7 even more than that, so we would object to the videos
8 being brightened.
9            THE COURT:  So what technology are you going to
10 use to brighten the videos?  Tell me what you have in
11 mind.
12            MS. PRZYBYLINSKI FINN:  Your Honor, it's just on
13 the computer itself.  You just -- you brighten up the
14 screen on the computer.  Some of the videos are a little
15 bit dark in places.  There's certain things that we need
16 to call the jury's attention to.  We've not altered the
17 videos at all.  It just brightens up the screen a little
18 bit, just like you can on your TV, like you can on your
19 phone.  There's nothing altered by the videos themselves.
20 It just brightens the screen you're looking at.
21            THE COURT:  So you're just talking about the
22 display brightener?
23            MS. PRZYBYLINSKI FINN:  The display, exactly.
24 And the displays in the jury box, in particular, are
25 darker than the screens out here.

1           THE COURT:  Okay.  And when were the videos
2   actually made, anyway?
3           MS. ALTMAN:  When?
4           THE COURT:  Yeah.  What year were the videos --
5           MS. PRZYBYLINSKI FINN:  2013 and 2014.
6           THE COURT:  Okay.  All right.  I'm going to allow
7   you to brighten the display of the videos, okay?  It's not
8   really altering them.  In 2013 you would have had any
9   photo editing software.  You would have had ample ability
10  to brighten them.  I don't really think that's the issue
11  anyway.
12      But I will allow you to brighten the display level.
13  That seems -- we're not even adjusting or enhancing the
14  videos themselves, we're just turning up the display
15  brightness, so I'll allow that.
16          MS. ALTMAN:  We don't have anything else, Your
17  Honor.
18          THE COURT:  Okay.  All right.  Mr. Bugni.
19          MR. BUGNI:  Just one clarification.  On the
20  introduction, based on all of the reports that we have,
21  Minor A was 16 years old.  Her birthday was 4/1/1997,
22  correct?  And so the first video is made on April 16th, so
23  she'd be 16 at the time.  So that would be the only thing,
24  just in the introduction of the case saying, "a girl who
25  was 16."

```
 1              THE COURT:  This is in the voir dire?
 2              MR. BUGNI:  Yes, Your Honor.
 3              THE COURT:  Okay.  Is there any objection to
 4   that?
 5              MS. ALTMAN:  Yes, Your Honor.  I mean, that's the
 6   date -- that modified date on the screen, but her
 7   testimony may be that she was 15 or 16.  We'd prefer it
 8   there.  I mean, we don't have to prove the exact age; we
 9   have to prove she was under 18.
10              THE COURT:  All right.
11              MR. BUGNI:  If the testimony is going to be like
12   that, then I have no problem with it.
13              THE COURT:  All right.  We don't know and so --
14   and you're talking about the introductory statement in the
15   void dire?
16              MR. BUGNI:  That's right, Your Honor.
17              THE COURT:  Okay.  The jury will have probably
18   long forgotten most of these details, so we'll leave it as
19   is.  Is that it?
20              MR. BUGNI:  That's it.
21              THE COURT:  All right.  Sounds like we're ready
22   to go, so we'll reconvene when the jury is queued up and
23   ready to bring them in.  Anything else?  There's activity
24   on the government side of the room.
25              MS. PRZYBYLINSKI FINN:  No.  I thought that we --
```

1 are you giving us the jury list after? I thought I lost
2 it already.
3       MS. ALTMAN: We were looking for the jury list.
4       MR. BUGNI: Judge, do you -- I know Judge Conley
5 has us -- like we don't stand up when the jury comes. I
6 haven't tried before you in a while.
7       THE COURT: We usually stand up when the jury
8 comes in and goes out, yeah, out of respect for them as
9 the finders of fact.
10    All right. Very good. We'll see you in about ten
11 minutes.
12    (Recess at 8:50 a.m. until 9:20 a.m.)
13       THE COURT: Are we ready to begin jury selection?
14       MS. PRZYBYLINSKI FINN: Yes.
15       MR. BUGNI: Ready to go.
16       THE COURT: All right. Let's bring in our jury
17 then.
18    (Prospective jurors in at 9:20 a.m.)
19       THE CLERK: Case No. 19-CR-25, the *United States*
20 *of America v. Alexander Kawleski*, called for a jury
21 selection and trial.
22       THE COURT: Good morning to all of you. We're
23 here at this point to begin jury selection in the case.
24 You'll get introduced to counsel and the parties in a
25 minute. Let me tell you what we're about to do.

1  I have to ask some questions of you so that I can
2  make sure that we have jurors who are qualified to serve
3  and don't have any bias that would make them inappropriate
4  to serve.  And we also have to get a little information
5  about you and your background so that the parties can make
6  their selections from those among you who are presented
7  for service to see who they would have liked to actually
8  select as the final members of the actual jury.
9     So we're going to have to ask you some questions that
10 you will all have to answer under oath.  So I'm going to
11 begin by asking all of you, those in the front of the
12 courtroom as well as those behind the bar in the gallery
13 portion of the courtroom, to stand up and raise your right
14 hand and the clerk will swear you all to answer my
15 questions honestly.

16                    **PROSPECTIVE JURORS, SWORN**

17      THE COURT:  Very good.  Have a seat.  I'm going
18 to begin by addressing my questions to those of you who
19 are in the front of the courtroom.
20      Those of you who are in the back of the courtroom,
21 I'll ask you to pay attention.  And the reason I'm going
22 to do that is if I have to replace one of the members of
23 the panel that is in the front of the courtroom with one
24 of you, I will have to do kind of a catch-up round while
25 I'll ask all the questions that we've covered so far of

1  you individually.  If you pay attention to my questions
2  now and imagine what your answers would be if you have to
3  answer these questions, we can do that catch-up round
4  really quickly and efficiently.  So please pay attention,
5  although you won't have to directly respond to my
6  questions.
7       This is a criminal case in which the defendant,
8  Alexander W. Kawleski, is charged with using a girl who
9  was 14 or 15 years old to engage in sexually explicit
10 conduct for the purpose of making a video recording of
11 this conduct.  The defendant is also charged with
12 attempting to produce several video recordings of the girl
13 and one video recording of another girl, who was 13 years
14 old, engaged in sexually explicit conduct.  Finally, the
15 defendant is charged with possessing child pornography.
16 The defendant has entered a plea of not guilty to the
17 charges against him.
18      Have any of you heard of this case before today?
19 Raise your hand if you have heard of this case before
20 today?
21           MR. BUGNI:  Your Honor, could we see you at
22 sidebar for a brief second?
23           THE COURT:  Yes.
24      (At sidebar.)
25           MR. BUGNI:  She's 15 to 16.

1            MS. ALTMAN:  15 to 16.  You said 14 to 15.
2            THE COURT:  I'm sorry.
3       (End sidebar.)
4            THE COURT:  My mistake.  I misread my own
5  instructions here.  The girl was 15 or 16 years old.  The
6  first girl was 15 or 16 years old.  My apologies.  So have
7  any of you heard of the case before today?
8       Let's talk about scheduling.
9       (**Voir Dire** held, but not transcribed, from 9:26 a.m.
10 until 1:10 p.m.)
11                    **JURY PANEL, SWORN**
12           THE COURT:  Have a seat.  I have some
13 instructions for you.  I'm going to give you only the bare
14 minimum of instructions that I need to give you before we
15 break for lunch and they're really quite simple.  Don't
16 talk to anybody, including each other, about this case.  I
17 will give you a fuller version and an explanation for all
18 of these reasons for my instructions in a minute after we
19 break for lunch.  But it's very important that you not
20 talk about the case at all until you get ready to
21 deliberate.  And the reason for that is that we can't have
22 you begin to make up your mind and debate the case before
23 you hear all of the evidence.  So don't talk about the
24 case.
25      Second thing that is very critical is do not try to

1   find out anything else about this case or to do any
2   research or look stuff up on the internet or on your phone
3   or anything like that.  You have to decide the case solely
4   on the basis of the evidence that's presented here in
5   court and not on the basis of anything that you can
6   discover on your own.  Please, do not do that.
7        So those are your two instructions: don't talk about
8   the case, don't try to find anything else out about the
9   case.  And we will give you an hour for lunch, plus four
10  minutes, so we will reconvene at 2:15, when we will begin
11  with my instructions and the opening statements by the
12  parties.
13       One last thing.  You can tell your family members
14  that you have been selected for jury service so they don't
15  think we've kidnapped you.  But please, don't tell them
16  even anything else about the case.  Just tell them you've
17  been selected to serve.  Don't say anything about the
18  case.
19       (Jury out at 1:13 p.m.)
20            THE COURT:  We will reconvene at ten minutes to.
21  Is that time enough for lunch?
22            MR. BUGNI:  It is, Your Honor.
23            THE COURT:  Okay.  Ten minutes to two, we will
24  reconvene.
25            MR. BUGNI:  Okay.

1     (Lunch recess at 1:13 p.m.)

2                         ***

3         I, CHERYL A. SEEMAN, Certified Realtime and Merit

4  Reporter, in and for the State of Wisconsin, certify that

5  the foregoing is a true and accurate record of the

6  proceedings held on the 15th day of July, 2019, before

7  the Honorable James D. Peterson, Chief Judge of the

8  Western District of Wisconsin, in my presence and reduced

9  to writing in accordance with my stenographic notes made

10 at said time and place.

11 Dated this 9th day of August, 2021.

15                           /s/

16                      Cheryl A. Seeman, RMR, CRR
                        Federal Court Reporter

23 The foregoing certification of this transcript does not
   apply to any reproduction of the same by any means unless
   under the direct control and/or direction of the
24 certifying reporter.